UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NexPoint Advisors, L.P.,

                    *Plaintiff*,

       *- against -*

TICC Capital Corp., Jonathan H. Cohen, Charles
M. Royce, Steven P. Novak, G. Peter O'Brien,
Tonia L. Pankopf, and Saul B. Rosenthal,

                *Defendants*.

Civil Action No.:

**VERIFIED COMPLAINT**

Plaintiff NexPoint Advisors, L.P. ("NexPoint"), by and through its undersigned attorneys, hereby submits this complaint against TICC Capital Corp. ("TICC"), the current members of the TICC Board of Directors, and the current TICC President, seeking to remedy defendants' violations of federal securities laws, breach of the common law duty of candor, and breach of the Second Amended and Restated Bylaws of TICC Capital Corp. (the "TICC Bylaws") in connection with the Special Meeting of Stockholders of TICC scheduled for October 27, 2015 (the "Special Meeting").  In support of its complaint, NexPoint states and alleges as follows:

## NATURE OF THE CASE

1.     Through this action, NexPoint, a stockholder of TICC, seeks to require TICC and its Board of Directors to hold a fair election of directors at the upcoming Special Meeting, rather than the rigged Soviet-style election defendants have now made clear they intend to hold. Specifically, on October 5, 2015, defendants advised NexPoint that at the Special Meeting TICC will not count votes in favor of the slate of directors duly nominated by NexPoint.  *See* App'x (timeline of key events).  Rather, TICC will only recognize votes cast for TICC's own nominees, absolutely ensuring their election even if the vast majority of stockholders vote against them. The stockholders of TICC must be permitted to exercise their right to vote.  Given that TICC

already is soliciting proxies for defendants' proposals, it is imperative that the Court act quickly to prevent the irreparable stockholder harm that would result from a rigged election.

2.      The defendants are desperate to prevent a real election that will give the stockholders an opportunity to choose nominees who might not support the self-interested transaction that TICC has negotiated and intends to implement.  Defendants have simply chosen to trample stockholder voting rights to secure their own personal gain, which on information and belief has ranged between $60 million and $132 million.  That personal gain will come at the expense of the corporation and therefore its innocent stockholders.

3.      In addition to their efforts to date to prevent both consideration of and voting for a properly nominated slate of alternative candidates, defendants have violated the federal securities laws by making false and misleading disclosures about the mechanics of the election and the choices available to stockholders, and by refusing to disclose and recognize NexPoint's nominees.  Defendants have misrepresented the election procedure by falsely stating that some principle of Maryland law prevents the nomination of any director other than TICC's chosen nominees.  Indeed, they have publicly said that a vote for NexPoint's nominees cannot be counted and is tantamount to a stockholder throwing away his votes.  This is false and misleading and must be corrected.

4.      In addition to the election of directors, at the Special Meeting TICC is seeking stockholder approval of a new advisory agreement.  Defendants have failed to disclose the most salient material facts concerning the TICC Board of Directors' determination that the proposed agreement is in the best interests of TICC and better than NexPoint's competing proposal. NexPoint's proposals forced TICC Management, LLC ("TICC Management"), TICC's current investment advisor, to concede as much as $72 million of value to TICC's stockholders, and

NexPoint's current proposal offers approximately an additional $45 million to $50 million of value that would be further redirected from TICC Management to TICC stockholders.

5.      What this boils down to is corporate insiders colluding with the so-called disinterested directors to manipulate the electoral process to implement a transaction that fleeces and disenfranchises TICC stockholders under the guise of a sham approval process where freedom of choice is eliminated and essential information is withheld.

6.      NexPoint believes its proposal is far better for TICC stockholders, but NexPoint does not need to convince the Court.  Rather, NexPoint only asks that TICC stockholders (a) be given non-misleading information and (b) be allowed to vote for which slate of directors they believe will best represent their interests.  The stockholders should not be misled in their voting, but rather should receive the facts so they can consider both defendants' and NexPoint's proposals based on full and fair disclosure.

7.      By way of background, TICC is a public company based in Greenwich, Connecticut.  It owns assets which are managed by an entity called TICC Management.  TICC Management is owned and controlled by defendants Jonathan H. Cohen, the TICC CEO and a member of the TICC Board of Directors; Charles M. Royce, the Chairman of the TICC Board of Directors; and Saul B. Rosenthal, the TICC President.  On information and belief, TICC Management's only significant asset is its contract to manage the funds belonging to TICC.

8.      TICC has scheduled a Special Meeting of Stockholders for October 27, 2015, at which stockholders will vote for the election of directors and, as required by the Investment Company Act of 1940, vote on whether to approve a new contract with TICC Management.  Stockholder approval of the new contract is required because TICC Management is selling itself to Benefit Street Partners L.L.C. ("BSP"), which will cause the current agreement between TICC

and TICC Management to terminate.  BSP will not go forward with the acquisition absent

stockholder approval of a new contract with TICC.

9.      As a result of BSP's planned acquisition of TICC Management, TICC President

Rosenthal, as well as TICC CEO and director Cohen and TICC Chairman Royce, stand to

personally gain tens of millions of dollars if TICC stockholders vote to approve the new

investment advisory agreement (the "New Advisory Agreement").

10.      According to its notice of the Special Meeting, there are two separate substantive

votes to be taken at the October 27, 2015 Special Meeting.  As set out by TICC, Proposal 1 is a

vote on whether to approve the New Advisory Agreement.  Proposal 2 is a vote to elect six

nominees to the TICC Board of Directors.  TICC proposed six nominees for election.

11.      On September 11, 2015, having received notice of the upcoming Special Meeting,

NexPoint duly nominated a competing slate of six directors in accordance with the TICC Bylaws

and began the process of developing proxy materials to solicit support for its slate of candidates.

Subsequent to making the nomination of a competing slate of directors (which TICC sought to

resist), NexPoint repeatedly requested confirmation from TICC that the nomination materials had

been received and were in good order.  TICC refused to respond, never indicating that the

nomination forms were other than in good order or that the NexPoint nominees could not stand

for election.  TICC also began to publicly advocate against NexPoint's management proposal

and in favor of their own, and also to advocate by means of materially false and misleading

statements in favor of the New Advisory Agreement, while at the same time conveniently

omitting any disclosure whatsoever regarding NexPoint's duly nominated board candidates.

12.      On October 5, 2015, defendants changed course and made clear that the

stockholder vote they had noticed is intended to be a sham and that no slate of candidates other

than TICC's slate will be recognized to receive votes at the Special Meeting.  In a letter to NexPoint, defendants asserted that stockholders, including NexPoint, are precluded from nominating an alternate slate of board nominees for the Special Meeting.  Because directors are elected by a plurality of votes cast, without an opposing slate of candidates, then by definition, *a single vote cast in favor of each TICC nominee will cause that director be elected, no matter how many votes are cast against that nominee (as long as a quorum of TICC stockholders is present for the Special Meeting).*  The individual defendants have sought to rig the outcome of the election:  because they hold more stock than the single share needed to ensure the election of the unopposed nominees, they are guaranteed to elect their own slate if no other candidates are allowed to run.

13.     Defendants' machinations to implement a Soviet-style election are as follows:  Once a quorum is present, then the nominees receiving a plurality of all votes will be appointed.  Defendants will ensure that only their slate of directors appears as an option, so a single vote in favor of a director constitutes a plurality.  The individual defendants, holding more stock than the single share needed to ensure the election of the *only* nominees, are guaranteed to elect their own slate.

14.     Defendants' assertion that no stockholder can nominate candidates for the TICC Board of Directors at the upcoming Special Meeting is flatly incorrect and nothing other than an attempt to steal the election.  It is black letter law that stockholders can nominate board candidates.  The TICC Bylaws codify that law by setting forth the mechanism by which stockholders can nominate candidates.  Here, on October 5, 2015, in utter violation of law and contrary to their own notice of meeting, defendants have put forward a theory that the election of directors is contingent on both the approval of the New Advisory Agreement and on the election

of defendants' own nominees, and that either if the New Advisory Agreement is not approved or other board candidates are elected, the director election is a nullity.  Thus, they assert there is no guarantee that *anyone* will be elected to the TICC Board of Directors at the upcoming Special Meeting.  With no guarantee that anyone will be elected to the TICC Board of Directors, defendants assert, no stockholder has a right to nominate director candidates at the Special Meeting, because Article II, Section 11(b)(iii) of the TICC Bylaws only permits stockholders to nominate board candidates if "directors shall be elected" at a special meeting.  Ex. 28 at 8 (TICC Bylaws).  This is a direct and intentional perversion of the Bylaw provision and the electoral process.  The Bylaw provision is intended to empower stockholders to nominate candidates, not preclude the nomination of an alternate slate via the tortured interpretation proffered by defendants.

15.     Defendants have also asserted that, absent approval of the New Advisory Agreement and their nominees, the Board size cannot accommodate six new members, because it is only "*effective upon the closing of the Transaction* [that] the Company's board will expand its size from five to nine."  But defendants disclosed in a September 3, 2015 proxy statement that they *already* increased the number of directorships from five to nine at July 30, 2015 and September 2, 2015 TICC Board of Directors meetings.  Defendants cannot explain how they can put up their own nominations for directorships that they say do not now exist.

16.     These machinations to frustrate the franchise of TICC stockholders are also consistent with TICC's materially misleading proxy statement and additional proxy materials about NexPoint's unsolicited proposal to become TICC's next investment advisor (the "NexPoint Proposal"); with the unseemly attempt of the TICC Corporate Secretary to evade service of NexPoint's nominating materials; and with defendants' weeks of stonewalling

NexPoint despite its repeated requests for confirmation that its duly-made nominations would be honored.  When these facts are taken together, it is impossible to escape the conclusion that defendants are manipulating corporate machinery to rig a stockholder vote, to mislead TICC stockholders, and to guarantee that the New Advisory Agreement and their own board nominees will be approved, enriching certain of the defendants at the expense of all TICC stockholders.  Alternatively, once it becomes clear that defendants may lose the proxy fight, they may seek to cancel the Special Meeting, entrenching themselves to the extended detriment of stockholders.  Neither of these attempts to disenfranchise stockholders should be allowed.

## PARTIES

17.     Plaintiff NexPoint Advisors, L.P. is a SEC-registered investment advisor.  It is the beneficial owner of one hundred shares of common stock of defendant TICC Capital Corp.  Ex. 1 (proof of stock ownership).  NexPoint's corporate headquarters are located in Texas.

18.     Defendant TICC Capital Corp. is a business development company incorporated in Maryland.  Its corporate headquarters are located in Connecticut.

19.     Defendant Jonathan H. Cohen is the Chief Executive Officer of TICC and is a member of the TICC Board of Directors.  On information and belief, Cohen is a resident of Connecticut.

20.     Defendant Charles M. Royce is Chairman of the TICC Board of Directors.  On information and belief, Royce is a resident of Connecticut.

21.     Defendant Steven P. Novak is a member of the TICC Board of Directors and is the Chair of its Audit Committee and Valuation Committee.  On information and belief, Novak is a resident of Connecticut.

22.     Defendant G. Peter O'Brien is a member of the TICC Board of Directors and is the Chair of its Nominating and Corporate Governance Committee.  On information and belief, O'Brien is a resident of Connecticut.

23.     Defendant Tonia L. Pankopf is a member of the TICC Board of Directors and is the Chair of its Compensation Committee.  On information and belief, Pankopf is a resident of New York.

24.     Defendant Saul B. Rosenthal is the TICC President.  On information and belief, Rosenthal is a resident of New York.

## JURISDICTION AND VENUE

25.     The federal claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 14a-9, 17 C.F.R. § 204.14a-9.

26.     This Court has jurisdiction over the subject matter of plaintiff's federal law claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

27.     This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c) and (d), because defendant TICC is headquartered in the State of Connecticut; because defendants Cohen, Royce, Novak, O'Brien, and Pankopf are directors of a corporation headquartered in the State of Connecticut; because defendant Rosenthal is an officer of a corporation headquartered in the State of Connecticut; because all but two of the defendants are residents of the State of Connecticut; and because a substantial portion

of the acts in furtherance of the wrongdoing and its effects have occurred or will occur in this

District.

**FACTUAL ALLEGATIONS**

**A.      TICC Management Enters into a Merger Agreement with BSP**

29.      The investment activities of TICC are managed by TICC Management.

Defendants Royce, Cohen, and Rosenthal control all ownership interests of TICC Management.

*See* Ex. 2 at 28 (Sept. 3, 2015 proxy statement).

30.      On August 4, 2015, TICC publicly announced an agreement, pursuant to which

BSP would acquire TICC Management (the "Transaction").  Ex. 3 (Aug. 4, 2015 press release).

31.      On information and belief, the value of the Transaction to TICC Management

could have been as high as $132 million.  This value would go to TICC Management, which is

controlled by defendants Cohen, the TICC CEO and a member of the TICC Board of Directors;

Royce, the Chairman of the TICC Board of Directors; and Rosenthal, the TICC President, rather

than to TICC stockholders.  *See* Ex. 4 at ¶ 5 (Surgent Declaration); Ex. 5 (Sept. 29, 2015

NexPoint press release).

32.      The Transaction would result in a change of control of TICC Management, and as

a result under the Investment Company Act of 1940, an assignment and subsequent termination

of the existing advisory agreement between TICC and TICC Management (the "Existing

Advisory Agreement").  *See* Ex. 2 at 16 (Sept. 3, 2015 proxy statement).

33.      The Investment Company Act of 1940 requires that a new investment advisory

agreement be approved by both a majority of an investment company's "non-interested"

directors and "a majority of the outstanding voting securities."  15 U.S.C. §§ 80a-15(a), (c).  The

TICC Board of Directors voted to approve the New Advisory Agreement between TICC and

BSP on July 30, 2015.  A Special Meeting of Stockholders at which TICC stockholders will vote

9

on whether to approve the New Advisory Agreement is scheduled for October 27, 2015.  Ex. 2 at 1 (Sept. 3, 2015 proxy statement).

      34.     The closing of the Transaction is conditioned on, among other things, approval of the New Advisory Agreement by TICC's stockholders; replacement of defendants Cohen and Royce as members of the TICC Board of Directors with two nominees affiliated with BSP; election of TICC's four other director nominees; and replacement of TICC's executive officers and TICC Management's investment committee members with individuals affiliated with BSP. Ex. 2 at 16 (Sept. 3, 2015 proxy statement).

**B.**      **NexPoint Submits an Unsolicited Proposal to Become TICC's New Investment Advisor**

      35.     NexPoint is the investment advisor to closed end fund NexPoint Credit Strategies Fund (the "Fund").  NexPoint and its affiliates have served as the Fund's investment advisor since its inception in 2006.  NexPoint, together with its affiliates, currently manages approximately $22 billion in net assets.  *See* Ex. 4 at ¶ 3 (Surgent Declaration).

      36.     On August 11, 2015, one week after TICC announced the Transaction, NexPoint submitted the NexPoint Proposal, an unsolicited proposal to the TICC Board of Directors to become TICC's new investment advisor.  Ex. 6 (Aug. 11, 2015 letter).  NexPoint publicly announced the NexPoint Proposal one week later.  Ex. 7 (Aug. 19, 2015 press release).

      37.     The NexPoint Proposal was significantly more cost effective for TICC and its stockholders than the Transaction.  First, NexPoint offered to accept a 50% reduction in the base management fee under the Existing Advisory Agreement for a period of three years, which would have reflected an aggregate savings to TICC stockholders of approximately $30 million. Second, NexPoint offered to waive the first $5 million of its management fee.  Third, NexPoint offered to purchase an aggregate of at least $10 million of TICC's common stock on the open

market to demonstrate its commitment to TICC and to strongly align its interests with TICC stockholders' interests.  Ex. 6 at 1-2 (Aug. 11, 2015 letter).

38.    After explaining the economics of the NexPoint Proposal in the August 11, 2015 letter, NexPoint explained in detail its "Experience and Advantages," including that it and its affiliates collectively managed approximately $22 billion in assets, its proven track record in investing in collateralized loan obligations, and a strong ratio of analysts per investment.  Ex. 6 at 2 (Aug. 11, 2015 letter).

39.    NexPoint made clear that the NexPoint Proposal was its opening offer, rather than its last and final offer, by stating that "we remain willing to consider any other terms that may be important to the Company and its stockholders."  Ex. 6 at 3 (Aug. 11, 2015 letter).

**C.    NexPoint Provides Due Diligence Materials to TICC**

40.    On August 18, 2015, a Special Committee of the TICC Board of Directors, chaired by defendant Novak and also including defendants O'Brien and Pankopf, sent NexPoint two pages of questions in categories including Financial Information, Description of Personnel and Services Provided to the Company, Investment Advice and Performance, Profitability, Compliance Program, Affiliates and Possible Conflicts, Current Legal Matters, and General.  Ex. 8 at 2-3 (Aug. 18, 2015 questionnaire).

41.    On August 24, 2015, NexPoint sent the Special Committee a twenty page response to the two page questionnaire.  Ex. 9 (Aug. 24, 2015 response).  More than half of NexPoint's response was dedicated to in-depth explanations of NexPoint's investment process and philosophy, risk management, and personnel.  Ex. 9 at 1-13 (Aug. 24, 2015 response). NexPoint also disclosed that the 2014 return for the Fund whose assets it managed was 26.83%; the 2015 return to date for the Fund was 22.29%; the trailing two year cumulative return for the

Fund was 93.61%; and the trailing two year annualized return for the Fund was 39.14%.  Ex. 9 at

13 (Aug. 24, 2015 response).

42.     In addition to supplying information contained in the August 24, 2015 response,

NexPoint sent the Special Committee a draft nondisclosure agreement and offered to provide

"additional information of a more confidential nature."  Ex. 10 (Aug. 24, 2015 email); Ex. 11

(draft nondisclosure agreement).  The Special Committee never returned a signed nondisclosure

agreement or otherwise requested any confidential information from NexPoint.  Ex. 4 at ¶ 6

(Surgent Declaration).

43.     On August 26, 2015, the Special Committee sent three follow-up questions to

NexPoint and requested a response within 24 hours.  Ex. 12 at 1-2 (Aug. 27, 2015 email thread).

NexPoint worked around the clock so that it could timely respond to the Special Committee's

questions.  *See* Ex. 4 at ¶ 7 (Surgent Declaration); Ex. 13 (Aug. 27, 2015 responses).

44.     In addition, NexPoint reiterated that it was willing to negotiate the economic

terms of its offer by stating that "we are willing to consider any additional or modified terms that

you may want to propose, in order to enhance the overall attractiveness of our proposal."  To

prove its seriousness, NexPoint volunteered to extend the 50% discount off its management fee it

originally offered for three years for an additional year, which would have created additional

savings of approximately $10 million to TICC stockholders.  Ex. 14 (Aug. 27, 2015 letter).

**D.     TICC Rejects the NexPoint Proposal Without Further Inquiry or Negotiation**

45.     The Special Committee did not follow up with NexPoint after it submitted its

August 27, 2015 supplemental responses.  Ex. 4 at ¶ 8 (Surgent Declaration).

46.     On August 31, 2015, Thomas Surgent of NexPoint called outside counsel to the

Special Committee, Thomas Westle of Blank Rome LLP, to inquire about the status of the

Special Committee's consideration of the NexPoint Proposal.  When Surgent asked whether the

Special Committee had any questions or concerns that NexPoint could address, Westle

dismissively responded that "they will do so if they deem that required or necessary," and ended

the call.  Ex. 4 at ¶ 9 (Surgent Declaration).

47.     NexPoint, believing that the Special Committee was deliberately ignoring the

NexPoint Proposal, issued a press release on September 1, 2015 identifying the economic

enhancements to its initial proposals, again offering to negotiate the economic terms of its

proposal, and expressing concern about the Special Committee's silence to date.  Ex. 15 (Sept. 1,

2015 press release).

48.     The Special Committee did not seek any additional information from NexPoint or

seek to negotiate the economic terms of the NexPoint Proposal.  Instead, as is discussed more

fully below, TICC issued a proxy statement on September 3, 2015 that summarily disclosed the

rejection of an unnamed third party's proposal to become TICC's investment advisor.  Ex. 4 at

¶ 10 (Surgent Declaration); Ex. 2 (Sept. 3, 2015 proxy statement).[1]

**E.     TICC Issues a Materially Misleading Proxy Statement**

49.     On September 3, 2015, TICC issued a proxy statement, signed by defendant

Rosenthal, notifying its stockholders of an October 27, 2015 Special Meeting where, inter alia,

they would vote on whether to approve the New Advisory Agreement ("Proposal 1").  Ex. 2

(Sept. 3, 2015 proxy statement).  The TICC Board of Directors recommended that stockholders

vote in favor of the New Advisory Agreement.  Ex. 2 at 29 (Sept. 3, 2015 proxy statement).  The

proxy statement also disclosed that the TICC Board of Directors had increased the number of

directorships from five to nine.  The TICC Board of Directors recommended votes in favor of six

---

[1] TICC has also rejected a proposal by TSG Specialty Lending, Inc. ("TSLX") to acquire TICC.  TSLX is
soliciting votes against the same stockholder proposals at issue here.  However, because the TSLX proposal is
unrelated to the NexPoint Proposal, the TICC Board of Directors' consideration of its merits and the disclosures
related to it are not discussed in detail in this Complaint.

nominees:  four to fill the newly created directorships, and two to replace defendants Cohen and

Royce with BSP affiliates ("Proposal 2").  Ex. 2 at 30 (Sept. 3, 2015 proxy statement).  The

proxy statement discloses that the Transaction will not be consummated if these six nominees are

not elected to the TICC Board of Directors.  Ex. 2 at 9-10 (Sept. 3, 2015 proxy statement).

50.     Under the bolded heading, Benefits of the Transaction, the proxy statement

contained a full page list of "potential benefits to the Company and its stockholders" of the New

Advisory Agreement.  Ex. 2 at 18-19 (Sept. 3, 2015 proxy statement).  In addition, under the

bolded heading, Board Consideration of the Approval of the New Advisory Agreement, the

proxy statement contained a second full page list of favorable "conclusions" reached by the

TICC Board of Directors about the New Advisory Agreement.  Ex. 2 at 23-24 (Sept. 3, 2015

proxy statement).

51.     The proxy statement was misleading in two kinds of ways.  First, it did not

disclose the magnitude of the insiders' financial benefit from the proposed transaction.  Second,

it misleadingly implied that the TICC directors had made a valid comparison between the BSP

proposal and the NexPoint Proposal in the proxy statement, while omitting material information

necessary to allow stockholders to assess the merits of the NexPoint Proposal themselves.

52.     First, the proxy statement did not disclose that defendants and TICC directors and

officers Cohen, Royce, and Rosenthal stood to gain at least tens of millions of dollars if

stockholders approved the New Advisory Agreement.  The proxy statement instead misleadingly

stated that Cohen, Royce, and Rosenthal would "receive substantial payments" if stockholders

approved the New Advisory Agreement.  Ex. 2 at 28-29 (Sept. 3, 2015 proxy statement).

53.     Second, the proxy statement did not provide a comparison to the NexPoint

Proposal, and prevented stockholders from making their own comparison.  Following the

14

extensive discussion of the purported benefits of the New Advisory Agreement, the proxy statement continued with a grossly inadequate description of the NexPoint Proposal.  The proxy statement disclosed only the economic terms offered by an unnamed "third party," and asserted without explanation that "the Special Committee determined that the greater benefit to the Company and its stockholders would be derived from BSP's strategy, reputation, institutional relationships, track record, investment skills and the quality of its management team and, as a result, the Special Committee continued to support the Transaction and the New Advisory Agreement."  The proxy statement added that after receiving the "third party's" proposal, TICC renegotiated the economics of the New Advisory Agreement.  Ex. 2 at 24 (Sept. 3, 2015 proxy statement).

54.    The proxy statement did not even mention NexPoint, instead referring to an unnamed "third party."  Ex. 2 at 24 (Sept. 3, 2015 proxy statement).  Because of this material omission, the proxy statement did not give TICC stockholders any basis to inform themselves about NexPoint, or to compare NexPoint to BSP, before deciding whether to vote to approve the New Advisory Agreement.

55.    The proxy statement also failed to disclose anything about the investment advisory services NexPoint offered to provide TICC.  As a case in point, the proxy statement asserted that the Special Committee preferred "BSP's strategy, reputation, institutional relationships, track record, investment skills and the quality of its management team."  Ex. 2 at 24 (Sept. 3, 2015 proxy statement).  But the proxy statement contained literally no description of NexPoint's "strategy, reputation, institutional relationships, track record, investment skills and the quality of its management team," and offered no meaningful comparison of the two proposals.  Because of these material omissions, the proxy statement did not supply any facts

about NexPoint's investment advisory services such that TICC stockholders could have fairly evaluated the statement's extensive praise of BSP's investment advisory services before deciding whether to vote to approve the New Advisory Agreement.

56.     On its face, the proxy statement's dismissive description of an unnamed "third party" with low rates and inferior "strategy, reputation, institutional relationships, track record, investment skills and . . . quality of its management team" creates the false and misleading impression that the NexPoint Proposal was put forth by an inexperienced, unheard-of investment advisor.  In reality, NexPoint is an established, reputable investment advisor whose bona fides are at least comparable to BSP's.  The proxy statement's misleading portrayal of NexPoint is especially notable in light of the detailed descriptions NexPoint gave the Special Committee of its investment philosophy, risk management, personnel, and historical performance.

57.     The proxy statement also failed to disclose that the Special Committee refused to negotiate with NexPoint, despite NexPoint's offers to do so.  Because of this material omission, the proxy statement did not inform TICC stockholders that TICC could have achieved a better economic deal than the one being recommended to stockholders, either by negotiating more favorable terms with NexPoint or by leveraging good-faith negotiations with NexPoint to extract further concessions from BSP.

58.     Furthermore, the fact that TICC leveraged the NexPoint Proposal to extract some concessions from BSP demonstrates that TICC either failed to negotiate effectively in the first instance or did not care about the financial terms of its long-term agreement with BSP.  On information and belief, the concessions TICC extracted from BSP may result in defendants and TICC directors and officers Cohen, Royce, and Rosenthal receiving less than they would have received under the initial offer.  But even with the reduced fee amount, Cohen, Royce, and

Rosenthal still stand to gain tens of millions of dollars from approval of the New Assignment

Agreement, which has not been adequately disclosed to stockholders.  *See* Ex. 5 at 3 & n.1 (Sept.

29, 2015 press release).

**F.     TICC Fails to Correct Its Materially Misleading
        Disclosures in Additional Proxy Materials**

59.     On September 29, 2015, October 2, 2015, and October 5, 2015, TICC filed

additional proxy materials signed by defendant and Special Committee Chair Novak.  For the

purpose of unfairly denigrating NexPoint, the additional proxy materials identified NexPoint as

the previously anonymous "third party" that had submitted an unsolicited proposal to become

TICC's new investment adviser.  *See* Ex. 16 (Sept. 29, 2015 additional proxy materials); Ex. 17

(Oct. 2, 2015 additional proxy materials); Ex. 18 at 3 (Oct. 5, 2015 additional proxy materials).

The additional proxy materials failed to disclose that defendants and TICC directors and officers

Cohen, Royce, and Rosenthal will receive tens of millions of dollars if TICC stockholders

approve the New Advisory Agreement; any information about the investment advisory services

NexPoint offered to provide TICC; or the failure of TICC to negotiate with NexPoint despite

NexPoint's repeated assurances that its proposed terms were negotiable.  The only "information"

TICC has been willing to give its stockholders about NexPoint is that the Special Committee

prefers BSP to NexPoint for unsubstantiated reasons.

60.     Furthermore, the September 29, 2015 and October 2, 2015 additional proxy

materials failed to disclose NexPoint's competing slate of board candidates, which had been duly

noticed weeks earlier.  The October 5, 2015 additional proxy materials acknowledged, at last,

that NexPoint's competing slate of board candidates existed, without mentioning the nominees'

names or qualifications, only for the purpose of falsely telling TICC stockholders that

NexPoint's nominations were invalid.

61.     On September 29, 2015, TICC told its stockholders, without explanation, that "BSP is – in our view – a better, stronger manager with a deeper investment bench, more experience and a better track record" than NexPoint.  Also without explanation, TICC told its stockholders that it "carefully evaluate[d] the NexPoint proposal," and that "[t]o be blunt – we didn't like it."  TICC questioned whether NexPoint's continued efforts to engage in discussions with the Special Committee, and efforts to inform stockholders about the flaws in the process leading to the New Advisory Agreement, were "[s]our grapes, maybe?"  Ex. 16 at 2 (Sept. 29, 2015 additional proxy materials).

62.     On October 2, 2015, TICC again told its stockholders, without explanation, that "NexPoint wants just to replace the investment advisor – TICC Management, LLC – and to take over the advisory role itself.  The problem with that is our **Special Committee believes Benefit Street Partners L.L.C. (BSP) is the far superior investment advisor and has recommended that you vote in favor of BSP.**"  Also without explanation, TICC told its stockholders:  "**BSP will be a much stronger partner for TICC than NexPoint –** in our view BSP's investment capabilities, experience, track record and loan origination capabilities are superior to those of NexPoint.  The bottom line:  TICC's Independent Special Committee reviewed NexPoint's proposal and decided it was NOT as good as the BSP agreement – and NOT in the best interests of TICC stockholders."  Ex. 17 at 1, 3 (Oct. 2, 2015 additional proxy materials).

63.     The October 5, 2015 additional proxy materials, which incorporated by reference a slide deck on TICC's website, included new material misrepresentations and omissions.  First, the slide deck misleadingly stated, **"NexPoint wants you to throw your vote away by voting for their director candidates whose nomination, we believe, is invalid."**  In a footnote, the slide deck added, **"Under Maryland law given the _contingent nature of the proposals_ to be**

**approved at TICC's special meeting of stockholders."** Ex. 18 at slide 5 (Oct. 5, 2015 additional proxy materials) (emphasis added). This statement was false and misleading because it (a) wrongly assumed that the TICC Board of Directors could condition the election of directors on stockholder approval of the New Advisory Agreement, (b) wrongly assumed that they in fact *had* imposed this condition, and (c) created the misimpression that Maryland law barred stockholders from nominating board candidates in such circumstances. These falsities call into the question the veracity of defendants' professed belief that NexPoint's nomination of board candidates is invalid. Defendants notably did not take issue with the form or substance of NexPoint's nomination notice in the October 5, 2015 proxy materials.

64.    Second, the slide deck misleadingly stated, "The Special Committee thoroughly considered the NexPoint . . . proposal[], . . . and is assisted by independent legal counsel at Wachtell, Lipton, Rosen & Katz and financial advisors at Morgan Stanley & Co. LLC." Ex. 18 at slide 6 (Oct. 5, 2015 additional proxy materials). This statement was a false and misleading "appeal to authority," creating the impression that the well-known firms Wachtell, Lipton, Rosen & Katz ("Wachtell") and Morgan Stanley & Co. LLC ("Morgan Stanley") had advised the Special Committee when it purportedly evaluated the NexPoint Proposal. As is discussed more fully below, Wachtell was not counsel to the Special Committee at the time the Special Committee evaluated the NexPoint Proposal; rather, the Special Committee retained Wachtell on or about September 30, 2015, nearly a month after defendants issued the proxy statement soliciting votes in favor of the New Advisory Agreement and opaquely announcing the rejection of the NexPoint Proposal. On information and belief, the Special Committee also retained Morgan Stanley weeks after issuing the September 3, 2015 proxy statement.

**G.      NexPoint Notices a Competing Slate of Directors**

65.      As explained more fully above, the September 3, 2015 proxy statement made clear that TICC's Board of Directors was unwilling to seriously consider the NexPoint Proposal or inform TICC stockholders about it.  That being the case, NexPoint made the decision not only to exercise its right at the Special Meeting to vote against the New Advisory Agreement, but also to nominate its own slate of six directors (Bob Froehlich, John Honis, Timothy Hui, Ethan Powell, William Swenson, and Bryan Ward) to fill the four newly created directorships and to replace defendants Cohen and Royce on the TICC Board of Directors.  Ex. 4 at ¶ 11 (Surgent Declaration).

66.      On September 11, 2015, NexPoint served notice on TICC that it would seek the election of a different slate of six directors at the Special Meeting than the ones put forth by the Board (the "Notice").  The Notice was made in accordance with Article II, Section 11 of the TICC Bylaws, which entitles stockholders to nominate potential directors within ten days of notice of an election.  The Notice included all relevant exhibits, including information and disclosures relating to the nominees, and made clear that "NexPoint intends to solicit proxies in support of the Nominees' election."  Ex. 19 at 7 (Sept. 11, 2015 notice).

67.      The Notice also requested that "[a]ny claim that this letter is in any way defective or deficient . . . should be addressed to Thomas Surgent . . . so that there is adequate opportunity to address such claim in a timely fashion."  The Notice further requested that TICC "[p]lease promptly confirm in writing  . . . that the Nominees will be included as nominees for election to the Board at the Special Meeting."  Ex. 19 at 7 (Sept. 11, 2015 notice).

**H.      TICC's Attempts to Frustrate a Stockholder Vote on NexPoint's Nominees**

68.      The first indication of TICC's intention to interfere with the board vote occurred on September 11, 2015, when Bruce Rubin, TICC's Secretary and Chief Financial Officer,

unsuccessfully sought to evade service of the Notice.  When Daniel Duhaime, a legal assistant

employed by NexPoint's outside counsel, Davis Polk & Wardwell LLP ("Davis Polk"), arrived

at TICC's corporate headquarters to serve the Notice, he requested that Rubin, as corporate

secretary, sign the acknowledgment of receipt attached to the Notice.  Rubin accepted the Notice

and began to review the acknowledgment, but as soon as he realized the Notice was from

NexPoint, he retreated to his office, claiming that he had to discuss it with "Saul" – most likely

referring to defendant and TICC President Saul Rosenthal.  Soon after, Rubin's assistant returned

to inform Duhaime that Rubin refused to sign the acknowledgment.  She further instructed the

security guard that Duhaime might need to be escorted from the building.  Duhaime had no

choice but to leave the Notice at the TICC security desk without obtaining an acknowledgment

of receipt.  Ex. 20 at ¶¶ 2-7 (Duhaime Affidavit).

      69.    Upon learning of Rubin's actions, Davis Polk attorney James Pyo emailed Rubin

attaching the Notice and requesting confirmation of receipt.  Ex. 21 at 1(Sept. 11, 2015 email).

The Notice was also forwarded to TICC's outside counsel, Steven Boehm of Sutherland Asbill &

Brennan LLP ("Sutherland").  Ex. 22 at 1 (Sept. 11, 2015 email).  This was in addition to the

request in the Notice itself that TICC "[p]lease promptly confirm in writing  . . . that the

Nominees will be included as nominees for election to the Board at the Special Meeting."  Ex. 19

at 7 (Sept. 11, 2015 notice).

      70.    By September 23, 2015, nearly two weeks after NexPoint served the Notice,

TICC still had given no indication that it intended to honor NexPoint's nomination of a

competing slate of directors, or any explanation for its silence on that issue.  Accordingly, Davis

Polk attorney Sarah Kim emailed Rubin again to "follow up on NexPoint's request" and ask that

Mr. Rubin provide "the requested confirmation by September 25."  Ex. 23 at 1 (Sept. 23, 2015

email).  The next day, Gregory Rowland of Davis Polk received a call from Harry Pangas and

Vlad Bulkin, two Sutherland attorneys, who promised that NexPoint would have the company's

response no later than September 29, 2015.  Pangas and Bulkin offered no explanation for

TICC's silence or any justification for the Company's lengthy delay in evaluating the Notice.

Ex. 24 at ¶ 7 (Rowland Declaration).

71.     Despite Sutherland's earlier assurances, TICC continued to stonewall.  By

September 29, 2015, NexPoint had not received confirmation as promised.  That evening,

Rowland emailed Pangas and Bulkin, reminding them of the September 24, 2015 conversation,

and stressing that "any further delay in such notification could interfere with NexPoint's rights as

a stockholder, including its rights to solicit support for its duly nominated candidates.  As such,

please inform me by no later than the end of the day today as to the Company's intentions in this

regard."  Ex. 25 at 1 (Sept. 29, 2015 email).

72.     The next day, Rowland received a call from Pangas and Bulkin to inform him that

a Special Committee of the TICC Board of Directors had retained Wachtell.  That same day,

Rowland called Eitan Hoenig at Wachtell, who had no substantive information to provide.

Despite previous assurances, NexPoint was forced to wait for confirmation that its nominees

would be placed on the ballot.  Ex. 24 at ¶ 9 (Rowland Declaration).

73.     October 1, 2015, with the Special Meeting fast approaching, Rowland emailed

Hoenig, copying Wachtell attorney David Shapiro, to say that "it has been nearly three weeks

since NexPoint notified the Company" of its nominations, during which it had "asked numerous

times for confirmation of the Company's intentions" regarding the ballot.  Rowland further

stressed that TICC's "delay has interfered, and continues to interfere, with NexPoint's rights as a

stockholder, including its rights to solicit support for its duly nominated candidates.  As such,

and based on our discussion, I understand that you will notify us promptly of whether the

Company intends to honor these nominations by NexPoint." Ex. 26 at 1 (Oct. 1, 2015 email).

     74.    Wachtell never responded to Rowland. Ex. 24 at ¶ 11 (Rowland Declaration).

Instead, on October 5, 2015, defendants posted a slide deck, incorporated by reference in

additional proxy materials, and therein stated that "NexPoint wants you to throw your vote away

by voting for their director candidates whose nomination, we believe, is invalid." Ex. 18 at slide

5 (Oct. 5, 2015 additional proxy materials). The slide deck stated in a footnote, "Under

Maryland law given the contingent nature of the proposals to be approved at TICC's special

meeting of stockholders." Ex. 18 at slide 5 (Oct. 5, 2015 additional proxy materials).

     75.    That same day, defendants sent NexPoint a letter to inform it that votes cast in

favor of its board nominees would not be counted, even though it in no way challenged the form

or substance of NexPoint's nominating notice:

> In connection with the Transaction, the Company's board of
> directors has also asked the Company's stockholders to vote at the
> Special Meeting to elect six Company-proposed director nominees
> to **fill vacancies that will only be created effective upon, and
> subject to, the closing of the Transaction**. As described in more
> detail in the Definitive Proxy Statement, it is a condition to closing
> the Transaction that all six individuals recommended by the
> Company join the Company's board of directors effective upon the
> closing of the Transaction. If the six Company-proposed director
> nominees and the BSP investment advisory agreement receive the
> requisite vote at the Special Meeting, then effective upon the
> closing of the Transaction, the Company's board will expand its
> size from five to nine, the Company's two interested directors will
> resign and the six resulting vacancies will be filled by the six
> Company-proposed director nominees. **Importantly, if the
> Transaction does not close, there will be no vacancies created
> on the Company's board of directors, and there will be no
> election of directors to the Company's board of directors.** The
> Definitive Proxy Statement made this very clear in Question 27
> under the section entitled "General Information About the Special
> Meeting and Voting": "If only Proposal 1 or Proposal 2 is
> approved by the Company's stockholders but not both proposals,

or if neither of these proposals is approved by the Company's stockholders, then the Transaction will not close and the Company will continue to operate pursuant to the Existing Advisory Agreement under the supervision of the existing Board of Directors and management team."

You have proposed to seek that stockholders elect an alternate slate of directors at the Special Meeting. As explained above and in the Definitive Proxy Statement, this is not possible: If your proposed directors were to receive sufficient votes to displace any of the six Company-selected nominees, the Transaction would not close, and there would be no vacancies to fill on the Company's board of directors. In other words, except for the very limited circumstances described above and in the Definitive Proxy Statement, the Company's board of directors has not determined that any "directors shall be elected at [the Special Meeting]" – which, as detailed in Section 11(b) of the Company's Second Amended and Restated Bylaws (the "***Bylaws***"), is the only circumstance that enables stockholders to nominate individuals for election as a director at a special meeting of stockholders. Because these limited circumstances could not exist if any of your proposed director nominees received sufficient votes to displace a Company-selected nominee, the proposed election of your director nominees at the Special Meeting is not a valid item of business under the Bylaws.

Ex. 27 at 1-2 (Oct. 5, 2015 letter).

76. Defendants' October 5, 2015 letter to NexPoint is both false and nonsensical. It is false insofar as it asserts, repeatedly and in boldfaced font, that vacancies on the TICC Board of Directors will not exist unless stockholders vote to approve both Proposal 1 (on the New Advisory Agreement) and Proposal 2 (on the director elections). Those vacancies currently exist: defendants already voted to create four new directorships, and already nominated six board candidates, including two to replace defendants Cohen and Royce. Ex. 2 at 30 (Sept. 3, 2015 proxy statement) ("Pursuant to the Company's bylaws, at meetings of the Board of Directors held on July 30, 2015 and September 2, 2015, the Board of Directors increased the size of the Board of Directors to nine members and recommended for election at the Special Meeting four new Non-Interested Director nominees and two new Interested Director nominees."). It is

24

nonsensical insofar as it suggests that Maryland law could possibly permit directors of Maryland corporations to entrench themselves, or their preferred board nominees, by stating that (a) voting results will count only if the directors' preferred nominees are elected, and (b) because there is a scenario in which the directors' preferred nominees could not be elected, stockholders are precluded from nominating alternate candidates.

### FIRST CAUSE OF ACTION
#### (for violation of Section 14(a) of the Exchange Act)

77.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

78.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "it shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title."

79.     SEC Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

80.     In the September 3, 2015 proxy statement, which defendant Rosenthal signed, defendants solicited TICC stockholders, including plaintiff, to vote to approve the New Advisory Agreement.  A stockholder vote is required to approval those proposals.  Thus, the proxy statement is an essential causal link in the accomplishment of the proposals.

81.     Defendants Jonathan H. Cohen, Charles M. Royce, Steven P. Novak, G. Peter O'Brien, and Tonia L. Pankopf are now, and have been at all relevant times, the members of the TICC Board of Directors.  Defendant Saul B. Rosenthal is now, and has been at all relevant times, the TICC President.

82.     With respect to the solicitation of proxies to approve the New Advisory Agreement, the proxy statement and additional proxy materials contain materially misleading statements and omit material facts.

83.     First, the proxy statement and additional proxy materials omitted the material fact that defendants and TICC directors and officers Cohen, Royce, and Rosenthal stood to gain at least tens of millions of dollars if stockholders approved the New Advisory Agreement.  Instead, the proxy statement misleadingly stated merely that Cohen, Royce, and Rosenthal would "receive substantial payments" if stockholders approved the New Advisory Agreement.

84.     Second, the proxy statement asserted that the Special Committee preferred BSP's "strategy, reputation, institutional relationships, track record, investment skills and the quality of its management team" to NexPoint's, but failed to provide any description of NexPoint's "strategy, reputation, institutional relationships, track record, investment skills, and the quality of its management teams."  The failure to disclose any of those facts about NexPoint left TICC stockholders without any information upon which to compare the TICC Board of Directors' self-

26

serving praise for BSP to NexPoint's objective qualifications.  These omissions have not been cured in the additional proxy materials.

85.     Third, the proxy statement and additional proxy materials failed to disclose that the Special Committee of the TICC Board of Directors never attempted to negotiate with NexPoint, despite NexPoint's repeated assurances that it was willing to negotiate its proposed terms.  This was a material omission because it left stockholders with an insufficient basis to determine whether they might have received a better economic deal than the one currently being offered to them, or whether the TICC Board of Directors was actually acting in their best interests.

86.     Fourth, the additional proxy materials created the materially false impression that Wachtell and Morgan Stanley advised the Special Committee on its evaluation of the NexPoint Proposal, when they did not.  This was a material falsehood because it left stockholders with the false impression that the Special Committee had received expert advice on how to evaluate the NexPoint Proposal that it did not in fact receive.

87.     The misrepresented or omitted facts are material because under all the circumstances presented here, there is a substantial likelihood that a reasonable stockholder would consider the false or misleading statements or omitted facts important in deciding how to vote on the New Advisory Agreement, or a material part of the mix of information available to stockholders in deciding how to exercise their voting rights.

88.     This claim is brought within the applicable statute of limitations.

89.     By reasons of the foregoing, these defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

## SECOND CAUSE OF ACTION
### (for violation of Section 14(a) of the Exchange Act)

90.     Plaintiff incorporates by reference and re-alleges each and every allegation

contained above, as though fully set forth herein.

91.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "it shall be

unlawful for any person, by the use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the Commission may prescribe as necessary or appropriate in the

public interest or for the protection of investors, to solicit or to permit the use of his name to

solicit any proxy or consent or authorization in respect of any security (other than an exempted

security) registered pursuant to section 78*l* of this title."

92.     SEC Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act,

prohibits the issuance of any proxy statement "which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary to make the statements therein not false or

misleading or necessary to correct any statement in any earlier communication with respect to

the solicitation of a proxy for the same meeting or subject matter which has become false or

misleading."  17 C.F.R. § 240.14a-9(a).

93.     In the September 3, 2015 proxy statement, which defendant Rosenthal signed,

defendants solicited TICC stockholders, including plaintiff, to vote to approve Proposal 2.  A

stockholder vote is required to approval this proposal.  Thus, the proxy statement is an essential

causal link in the accomplishment of the proposals.

94.     Defendants Jonathan H. Cohen, Charles M. Royce, Steven P. Novak, G. Peter

O'Brien, and Tonia L. Pankopf are now, and have been at all relevant times, the members of the

TICC Board of Directors.  Defendant Saul B. Rosenthal is now, and has been at all relevant times, the TICC President.

95.     With respect to the solicitation of proxies to approve Proposal 2, the proxy statement and additional proxy materials contain materially misleading statements and omit material facts.

96.     First, the additional proxy materials, which were filed weeks after NexPoint duly submitted its nominating notice, mentioned neither the names of NexPoint's board nominees nor their qualifications.  These omissions left stockholders without any basis to compare the nominees put forward by defendants with the nominees put forward by NexPoint.

97.     Second, the additional proxy materials falsely stated that the election of directors at the Special Meeting was contingent and that Maryland law precludes stockholders from nominating board candidates in contingent elections.  In the first place, the election is not contingent on any other proposal, but even if defendants, intended it to be, defendants may not design director elections to be counted only if their chosen nominees are elected, and Maryland law does not prohibit stockholders from nominating board candidates in such circumstances. These falsehoods left stockholders with the incorrect view that there was a basis for defendants' professed belief that NexPoint's nomination of board candidates is invalid.

98.     Furthermore, each and all of the material misstatements and omissions related to plaintiff's First Cause of Action also could have informed TICC stockholders' decisions as to whether to vote for board candidates nominated by TICC or NexPoint.

99.     The misrepresented or omitted facts are material because under all the circumstances presented here, there is a substantial likelihood that a reasonable stockholder would consider the false or misleading statements or omitted facts important in deciding how to

vote on Proposal 2, or a material part of the mix of information available to stockholders in deciding how to exercise their voting rights.

100.    This claim is brought within the applicable statute of limitations.

101.    By reasons of the foregoing, these defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

## THIRD CAUSE OF ACTION
### (for violation of the common law duty of candor)

102.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

103.    Directors and officers of Maryland corporations owe their stockholders a common law duty of candor.  A cause of action for breach of the duty of candor is a direct claim that falls outside the scope of Md. Code, Corps. & Ass'ns § 2-405.1(g).

104.    The individual defendants breached the common law duty of candor by failing to disclose to TICC stockholders:  (i) that directors and officers Cohen, Royce, and Rosenthal stood to gain tens of millions of dollars from the approval of the New Advisory Agreement; (ii) the substantive information about investment advisory services that NexPoint offered to provide; (iii) that TICC did not negotiate with NexPoint despite NexPoint's repeated offers to negotiate; (iv) that Wachtell and Morgan Stanley did not advise them on the NexPoint Proposal; and (v) that Maryland law entitles stockholders to nominate board candidates at the Special Meeting.

105.    Unless enjoined from doing so, the individual defendants will continue to breach the common law duty of candor owed to TICC stockholders.

106.    Plaintiff has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (for breach of contract)

107.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

108.   The elements of a breach of contract claim under Maryland common law are the existence of a contractual obligation owed by the defendant to the plaintiff, a breach of that obligation, and damages.

109.   The Second Amended and Restated Bylaws of TICC Capital Corp. is a binding contract between TICC and its stockholders, including NexPoint.  As directors and officers of TICC, the individual defendants are required to adhere to the TICC Bylaws.

110.   Article II, Section 11(b)(iii) of the TICC Bylaws provides, "Nominations of individuals for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected . . . provided that the Board of Directors has determined that directors shall be elected at such special meeting, by any stockholder of the Corporation who is a stockholder of record both at the time of giving of notice provided for in this Section 11 and at the time of the special meeting, who is entitled to vote at the meeting and who complied with the notice procedures set forth in this Section 11."

111.   The individual defendants have anticipatorily breached Article II, Section 11(b)(iii) of the TICC Bylaws by stating their intent not to count votes cast in favor of NexPoint's board candidates at the October 27, 2015, Special Meeting of Stockholders or to appoint those candidates to the TICC Board of Directors if they are elected, even though the TICC Board of Directors has determined that directors shall be elected at the Special Meeting and NexPoint complied with the stock ownership and notice requirements of Article II, Section 11 of the TICC Bylaws.

112.    Unless enjoined from doing so, defendants will in fact breach Article II, Section 11(b)(iii) of the TICC Bylaws by not counting votes cast in favor of NexPoint's board candidates at the Special Meeting, and not seating NexPoint's board candidates if they are elected.  This breach would harm NexPoint by irreparably violating its stockholder rights to duly nominate board candidates and to cast valid votes in favor of those candidates.

113.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of plaintiff and against defendants as follows:

a) An injunction requiring defendants to hold the October 27, 2015 Special Meeting as currently scheduled, or at a later date to be determined by the Court;

b) An injunction requiring defendants to hold the election of directors contemplated by Proposal 2 at the Special Meeting, to count votes cast at the Special Meeting for board nominees put forward by NexPoint, and, if such nominees are elected, to seat them as members of the TICC Board of Directors;

c) An injunction requiring defendants to issue additional proxy materials retracting statements that votes cast at the Special Meeting for board nominees put forward by NexPoint will not be counted, and disclosing that votes cast at the Special Meeting for board nominees put forward by NexPoint will be counted;

d) An injunction requiring defendants to issue additional proxy materials disclosing that defendants Cohen, Royce, and Rosenthal stand to gain tens of millions of dollars if TICC stockholders approve the New Advisory Agreement with BSP; disclosing substantive information about the investment advisory services NexPoint offered to provide, including but not limited to NexPoint's strategy, reputation, institutional relationships, track record, investment

skills, and the quality of its management team; disclosing that TICC did not negotiate with

NexPoint despite NexPoint's repeated offers to negotiate; and disclosing that Wachtell and

Morgan Stanley did not advise the Special Committee when it evaluated the NexPoint Proposal;

and

      e) For any such other and further relief as this Court may deem just and proper, including

an award of costs and attorney's fees to NexPoint enforceable against the individual defendants.

Dated:   New York, New York
         October 7, 2015


DAVIS POLK & WARDWELL LLP

By:

      Lawrence Portnoy (ct29249)
      Alan J. Tabak*
      Moses Sternstein*

450 Lexington Avenue
New York, New York 10017
(212) 450-4000
lawrence.portnoy@davispolk.com
alan.tabak@davispolk.com
moses.sternstein@davispolk.com

- and -

Helen Harris (ct26816)
Kevin C. Brown (ct29774)
DAY PITNEY LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 997-7418
hharris@daypitney.com
kbrown@daypitney.com

                        - and -

                        Robert T. Shaffer, III*
                        ZUCKERMAN SPAEDER LLP
                        100 East Pratt Street, Suite 2440
                        Baltimore, Maryland 21202
                        (410) 332-0444
                        rshaffer@zuckerman.com

                        - and -

                        Adam L. Fotiades*
                        ZUCKERMAN SPAEDER LLP
                        1880 M Street, N.W., Suite 1000
                        Washington, D.C. 20036
                        (202) 778-1893
                        afotiades@zuckerman.com

                        *Attorneys for Plaintiff*
                         *NexPoint Advisors, L.P.*

                        * *pro hac vice* applications forthcoming

## APPENDIX:  TIMELINE OF KEY EVENTS

| Date | Action |
|---|---|
| 7/30/2015 | The TICC Board of Directors votes to approve the New Advisory Agreement between TICC and BSP, pursuant to which BSP would acquire TICC Management.  The TICC Board of Directors also votes to increase the number of directorships from five to nine. |
| 8/11/2015 | NexPoint submits its first proposal to the TICC Board of Directors. |
| 8/24/15 | NexPoint submits due diligence materials to a Special Committee of the TICC Board of Directors. |
| 8/27/15 | NexPoint submits additional due diligence materials to the Special Committee, and voluntarily offers to revise the economic terms of its proposal. |
| 9/1/2015 | NexPoint announces a revised economic proposal. |
| 9/2/2015 | The TICC Board of Directors again votes to approve the New Advisory Agreement, and to increase the number of directorships from five to nine. |
| 9/3/2015 | TICC files a proxy statement announcing the October 27, 2015 Special Meeting, and requesting stockholder approval of the New Advisory Agreement and nominating six new directors.  TICC also discloses the rejection of an unnamed third party's proposal to become TICC's investment advisor. |
| 9/11/2015 | NexPoint serves notice that it has nominated six directors for election at the Special Meeting. |
| 9/29/2015 | TICC files additional proxy materials. |
| 9/29/2015 | NexPoint files a press release estimating that the initial consideration for TICC Management from the Transaction could have been as high as $132 million, and today may be approximately $60 million. |
| 9/30/2015 | The Special Committee retains Wachtell to advise it in connection with NexPoint's nomination of board candidates. |
| 10/2/2015 | TICC files additional proxy materials. |
| 10/5/2015 | TICC notifies NexPoint that TICC will not count votes in favor of NexPoint's board candidates, and will only recognize votes cast for TICC's own nominees. TICC also files additional proxy materials telling voters that NexPoint's nomination of board candidates was invalid under Maryland law. |
| 10/27/2015 | Special Meeting of TICC Capital Corp. stockholders. |

## VERIFICATION

I, Thomas Surgent, am Partner, Deputy General Counsel, and Chief Compliance Officer at Highland Capital Management, L.P., and Deputy General Counsel at NexPoint Advisors, L.P., the plaintiff in this action, by way of a shared services agreement.  I have read the foregoing complaint and know the contents thereof, and the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe to be true.  I verify under penalty of perjury that the foregoing is true and correct.  Executed on October 7, 2015.

_____
Thomas Surgent