## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NEXPOINT ADVISORS, L.P.,

                Plaintiff,

      v.

TICC CAPITAL CORP., JONATHAN H.
COHEN, CHARLES M. ROYCE, STEVEN P.
NOVAK, G. PETER O'BRIEN, TONIA L.
PANKOPF, AND SAUL B. ROSENTHAL,

                Defendants.

Case No. 3:15-cv-01465

Judge Charles S. Haight, Jr.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

MILES & STOCKBRIDGE, P.C.
100 Light Street
Baltimore, Maryland  21202-1487

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019-6150
Telephone:  (212) 403-1000

FINN DIXON & HERLING, LLP
177 Broad Street
Stamford, Connecticut  06901

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF THE CASE..................................................................................................4

    A.    TICC is an investment company managed by
a majority independent board...............................................................4

    B.    TICC's board determines that a transaction between TICC Management
and Benefit Street Partners would be in the best interests of TICC
stockholders. ............................................................................................5

    C.    TICC conditionally expands its board to comply with Section 15(f)
of the Investment Company Act. ..........................................................6

    D.    TICC announces the transaction between TICC Management and BSP
and receives a competing proposal from NexPoint. .........................7

    E.    NexPoint puts forward an invalid slate of directors to advance its bid. .................9

ARGUMENT ..............................................................................................................10

POINT I       PLAINTIFF HAS FAILED TO SHOW ANY LIKELIHOOD OF
SUCCESS ON THE MERITS. .................................................................10

    A.    Federal law bars the relief NexPoint seeks. .....................................11

    B.    Maryland law and TICC's governing documents bar
the relief NexPoint seeks. ....................................................................13

    C.    Plaintiff's disclosure claims are baseless.........................................17

    D.    Considerations of subject matter jurisdiction and comity weigh
heavily against a Connecticut federal court issuing an injunction
under Maryland corporate law. ...........................................................22

POINT II     PLAINTIFF HAS FAILED TO SATISFY ANY OF THE EQUITABLE
ELEMENTS FOR OBTAINING A PRELIMINARY INJUNCTION.................25

    A.    Plaintiff cannot show a threat of irreparable harm.................................25

    B.    The balance of the equities weighs heavily against an injunction. .......................25

    C.    The injunction plaintiff seeks would be against public policy. ............................26

CONCLUSION..................................................................................................27

# TABLE OF AUTHORITIES

<u>CASES</u>

*Blasius Industries, Inc.* v. *Atlas Corp.*,
    564 A.2d 651 (Del. Ch. 1988) ........................................................................17

*Bowen* v. *Goldstein*,
    2007 WL 4457242 (S.D.N.Y. Dec. 13, 2007) ...............................................25

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ........................................................................18

*Cacchillo* v. *Insmed, Inc.*,
    638 F.3d 401 (2d Cir. 2011)..........................................................................10

*De Asencio* v. *Tyson Foods, Inc.*,
    342 F.3d 301 (3d Cir. 2003) ....................................................................23-24

*Doniger* v. *Niehoff*,
    527 F.3d 41 (2d Cir. 2008)............................................................................10

*Field* v. *Trump*,
    850 F.2d 938 (2d Cir. 1988)..........................................................................18

*Gould* v. *American-Hawaiian S. S. Co.*,
    535 F.2d 761 (3d Cir. 1976).....................................................................20 n.8

*Grace* v. *Rosenstock,*
    228 F.3d 40 (2d Cir. 2000).......................................................................24 n.9

*Grand River Enter. Six Nations, Ltd.* v. *Pryor*,
    481 F.3d 60 (2d Cir. 2007)............................................................................10

*Kademian* v. *Ladish Co.*,
    792 F.2d 614 (7th Cir. 1986) ........................................................................18

*Kas* v. *Financial Gen. Bankshares, Inc.*,
    796 F.2d 508 (D.C. Cir. 1986) ...........................................................18, 20 n.8

*Kellner* v. *U.S. Army Corps. of Engineers*,
    2014 WL 753927 (S.D.N.Y. Feb. 26, 2014)..................................................25

*Koppel* v. *4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999)....................................................................18, 22

*Lemon Bay Partners LLP* v. *Hammonds*,
    2007 WL 1830899 (D. Del. June 26, 2007)..................................................23

*McCrae Assocs.* v. *Universal Capital Mgmt.*,
    746 F. Supp. 2d 389 (D. Conn. 2010) ............................................................13

*Merritt* v. *Colonial Foods, Inc.*,
    499 F. Supp. 910 (D. Del. 1980) ..................................................................23

*Resnik* v. *Swartz*,
    303 F.3d 147 (2d Cir. 2002) ........................................................................19

*Rodman* v. *Grant Found.*,
    608 F.2d 64 (2d Cir.1979) ...........................................................................20

*Rogers* v. *Guar. Trust Co. of New York*,
    288 U.S. 123 (1933) .....................................................................................24

*Santa Fe Indus., Inc.* v. *Green*,
    430 U.S. 462 (1977) .....................................................................................18

*Sea Containers Ltd.* v. *Stena AB*,
    890 F.2d 1205 (D.C. Cir. 1989) ..................................................................20

*Shaker* v. *Foxby Corp.*,
    2005 WL 914385 (Md. Cir. Ct. Mar. 15, 2005) ....................................17 n.7

*Szymborski* v. *Ormat Tech., Inc.*,
    776 F. Supp. 2d 1191 (D. Nev. 2011) .........................................................21

*Tackney* v. *U.S. Naval Acad. Alumni Ass'n*,
    408 Md. 700 (2009) .....................................................................................17

*Taro Pharm. Indus., Ltd.* v. *Sun Pharm. Indus., Ltd.*,
    2010 WL 2835548 (S.D.N.Y. July 13, 2010) .............................................20

*TSC Indus., Inc.* v. *Northway, Inc.*,
    426 U.S. 438 (1976) .....................................................................................17

*United Mine Workers of Am.* v. *Gibbs*,
    383 U.S. 715 (1966) .....................................................................................23

*Vandiver* v. *Hardin Cnty. Bd. of Educ.*,
    925 F.2d 927 (6th Cir. 1991) ...................................................................24 n.9

*Vides* v. *Amelio*,
    265 F. Supp. 273 (S.D.N.Y. 2003) ...............................................................8

*Weiss* v. *Routh*,
    149 F.2d 193 (2d Cir. 1945) ........................................................................24

*Western In*v. *Hedged Partners* v. *Sunset Fin. Res.*,
    2006 WL 4639855 (Md. Cir. Ct., Mar. 7, 2006)......................................17 n.7

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................10

**STATUTES**

15 U.S.C. § 80a-2(a) ...............................................................4 n.1, 16 n.6

15 U.S.C. § 80a-15(a) ...............................................................................5

15 U.S.C. § 80a-15(c) ...............................................................................5

15 U.S.C. § 80a-15(f) ........................................................................ *passim*

15 U.S.C. § 80a-16(b) ....................................................................... *passim*

28 U.S.C. § 1367(c) .................................................................................23

MD. CODE ANN., CORPS. & ASS'NS § 2-401 (West. 2015) .............................13

MD. CODE ANN., CORPS. & ASS'NS § 3-802 (West. 2015) ......................14 n.3

MD. CODE ANN., CORPS. & ASS'NS § 3-804(c) (West. 2015) .................. 13-14

**OTHER**

S. Rep. No. 94-75 (1975) ..........................................................................11

Defendants respectfully submit this Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction.

## PRELIMINARY STATEMENT

Plaintiff NexPoint's *ex parte* motion is an improper attempt by a competitor to derail a stockholder vote on a beneficial transaction that was approved by TICC's board.  It grossly distorts the facts of that transaction and fails to cite controlling provisions of federal and state law.  Although the proxy statement that TICC filed with the SEC makes perfectly clear that the purpose of the upcoming special meeting is to comply with the Investment Company Act of 1940, plaintiff entirely ignores both the ICA and TICC's corporate charter, which vest the company's *current directors* with exclusive authority to nominate directors for the upcoming special meeting.  This controlling authority makes clear that plaintiff's purported nominees cannot be seated without the support of TICC's board, which they do not have.  The TRO should be immediately dissolved and plaintiff's request for an injunction should be denied.

This case arises from a decision by TICC's board to retain an affiliate of Benefit Street Partners as an investment advisor to bring value to TICC and its stockholders.  BSP is a nationally recognized investment management firm with more than $10 billion in assets under management.  It has entered into an agreement to acquire TICC's current investment advisor, TICC Management.  TICC's stockholders will have the opportunity to vote on a new advisory agreement in connection with that transaction, and can accept or reject it at a special meeting scheduled for October 27.

The BSP transaction has been structured to comply with Section 15(f) of the ICA, which requires TICC's board to be comprised of at least 75% independent directors for a period of three years after the sale of TICC Management to BSP.  In keeping with this statute, TICC's board, which currently consists of three independent directors and two directors affiliated with TICC

Management, has resolved to add four new independent directors.  It has also resolved to replace two directors who are affiliated with TICC Management with two directors affiliated with BSP. Both of these resolutions are expressly conditioned on BSP completing its acquisition of TICC Management.

After the BSP transaction was announced, NexPoint — a BSP competitor — sent TICC's board an unsolicited proposal to take over as TICC's investment advisor instead of BSP.  Upon receiving that offer, TICC's board formed a special committee of independent directors to evaluate NexPoint's proposal.  The committee consulted with its independent legal counsel and solicited additional information from NexPoint.  After careful review, the committee determined that NexPoint's proposal was not in the best interests of TICC or its stockholders.  The committee considered, among other factors, NexPoint's lack of relevant experience, its inadequate record of historical performance, and its reputation as compared to BSP's.

In response to the rejection of its offer, NexPoint sought to supplant the business judgment of TICC's independent directors with its own.  NexPoint spent $668 to purchase 100 shares of TICC stock and nominated a slate of its own directors to compete with those proposed in connection with the BSP transaction.  After being told that its nominations were improper, NexPoint brought this action, under the guise of advancing stockholder rights, to pursue its own offer to take over as TICC's investment advisor and to scuttle the BSP transaction.

But NexPoint's purported nominations to TICC's board plainly violate both federal law and TICC's charter.  Under the express terms of the charter, TICC's *board* has the exclusive right to fill vacancies, unless otherwise required by the ICA.  Stockholders do not participate in the process.  And under the ICA, when vacancies are filled in connection with Section 15(f) to ensure that a company's board is at least 75% independent, nominees *must* be selected by the

2

company's *independent directors*, and then approved by its stockholders.  NexPoint's nominees have *not* been selected by TICC's board or its independent directors.  Therefore, they do not — and cannot — meet the plain text requirements of the charter or the ICA.

Although NexPoint's core claim for relief, such as it is, focuses exclusively on its purported rights as a stockholder pursuant to Maryland *state* law, it has also manufactured two federal claims for alleged proxy disclosure violations for the sole purpose of bringing its suit in federal court.  The primary disclosure claim merely recasts NexPoint's state-law objections in federal garb, arguing that TICC's proxy statement is misleading for leaving out information about NexPoint's purported nominees.  For the reasons set forth above, NexPoint's purported nominations *are* invalid.  TICC has correctly disclosed that fact, and nothing more is required.

NexPoint's other disclosure claim is equally without merit.  NexPoint does not seriously contend that any of the material in the proxy statement is false; rather, it focuses on various supposed "omissions" from the disclosure.  NexPoint's argument is belied by the proxy statement, which contains paragraphs of disclosure relating to the benefits that the two interested TICC directors may get from selling their company to BSP, the special committee's consideration of NexPoint's proposal, and its decision to reject that offer as inferior to the BSP deal.  For its part, NexPoint has made multiple filings with the SEC touting the supposed benefits of its proposal and remains free to continue making its case to TICC's stockholders.

Despite the hyperbole of NexPoint's papers, there is absolutely nothing unfair or improper about the actions that TICC is taking in compliance with law and its charter.  TICC's board has put forward a transaction that will not close unless stockholders vote in favor of it.  NexPoint can plead its case to TICC's stockholders, but it must do so within the bounds of governing authority.  The injunctive relief that NexPoint seeks is contrary to the ICA, Maryland

law, and TICC's charter.  The TRO should be dissolved and NexPoint's request for injunctive relief denied.

## STATEMENT OF THE CASE

**A.     TICC is an investment company managed by a majority independent board.**

TICC is an investment company organized under Maryland law and headquartered in Connecticut.  *See* 2014 Form 10-K at 1, 3-4 (Ex. A).  The company's assets are managed by TICC Management, an external investment advisor, under an investment advisory agreement signed by the two companies, which is reviewed annually by TICC's board.  *Id.* at 3.  Neither TICC nor its public stockholders have an ownership interest in TICC Management, and the companies are separate corporate entities.  *Id.*

TICC is overseen by a five-person board that is comprised of a majority of independent directors.[1]  Three of the directors — Steven P. Novak, G. Peter O'Brien, and Tonia L. Pankopf — are outside directors with no connection to management or the company beyond their service on the board.  *See* Sept. 3, 2015 Proxy [hereinafter "Proxy"] at 34-36 (Ex. B).  The remaining two directors — Jonathan H. Cohen and Charles M. Royce — are affiliated with TICC Management.  *Id.*  All of the directors have been named as defendants in this action.  TICC's President (Saul Rosenthal), who is not a director, is also named as a defendant in this action.  Compl. ¶¶ 19-24.

TICC holds director elections on an annual basis and stockholders may nominate and elect directors for such meetings pursuant to the bylaws.  *See* Bylaws Art. 2 § 2 (Ex. C).  TICC's board is divided into classes, and directors serve staggered terms of three years.  *See* Proxy at 30

---

[1]  A director is independent under the ICA if he or she is not an "interested person" within the meaning of Section 2(a)(19).  *See* 15 U.S.C. § 80a-2(a)(19).

(Ex. B).  TICC's last regularly scheduled director election was held just four months ago, at

TICC's annual stockholder meeting on June 10, 2015.  *See* Apr. 29, 2015 Proxy at 1 (Ex. D).

**B.     TICC's board determines that a transaction between TICC Management and Benefit Street Partners would be in the best interests of TICC stockholders.**

On July 13, 2015, TICC's board met to discuss a proposal for Benefit Street Partners,

L.L.C. to acquire TICC Management and enter into a new investment advisory agreement with

TICC.  Proxy at 22 (Ex. B).  BSP is an affiliate of Providence Equity Partners, a $40 billion asset

management firm.  *Id.* at 2.  BSP alone has approximately $10.7 billion in assets under

management, including $4.2 billion in private debt funds, and a strong investment track record in

the origination of and investment in loans issued by mid-market companies.  *Id.*

Although BSP's acquisition of TICC Management does not directly involve TICC, the

transaction will result in termination of the advisory agreement between TICC Management and

TICC.  As required by the ICA, any change in control of an investment advisor automatically

terminates the advisory agreement between the company and its investment advisor.  15 U.S.C. §

80a-15(a); Proxy at cover letter, 4 (Ex. B).  The company must then enter into a new agreement

with the investment advisor, which requires approval of both a majority of stockholders and the

board.  15 U.S.C. § 80a-15(a), (c).

Throughout July, TICC's board met several times to consider the proposed transaction

between BSP and TICC Management and determine whether it would be beneficial for TICC's

stockholders.  Proxy at 22-23 (Ex. B).  TICC's directors carefully reviewed the terms of the new

investment advisory agreement and asked BSP to fill out a questionnaire providing additional

information that the board needed to evaluate its proposal.  Oct. 9, 2015 ISS Presentation at 9

(Ex. E).  TICC's independent directors also consulted with independent legal counsel.  Proxy at

24 (Ex. B).

On July 30, the board, including a majority of the independent directors, approved the new advisory agreement and recommended that stockholders vote in its favor. *Id.* at 16. TICC's board considered many factors in determining that the new agreement would be in the best interests of TICC's stockholders, including BSP's experience as an investment advisor, its strong performance record, its investment research capabilities, and its extensive global resources and networks, including through its affiliation with Providence. *Id.* at 2-3, 18-19, 22-24.

## C. TICC conditionally expands its board to comply with Section 15(f) of the Investment Company Act.

In order to engage BSP as its new investment advisor, TICC's board also voted to *conditionally* expand the board from five to nine directors. *Id.* at 9; Oct. 5, 2015 Proxy at 1 (Ex. F). It took this step because, under Section 15(f) of the ICA, a person affiliated with an advisor to an investment company may only receive a benefit from selling its interest if, among other things, the board of the investment company is comprised of at least 75% independent directors for a period of 3 years after the transaction. 15 U.S.C. § 80a-15(f); Proxy at 4, 30 (Ex. B). Thus, the owners of TICC Management may only benefit from a sale of their interests to BSP — and the sale will only go forward to TICC's benefit — if after the sale TICC's board is comprised of at least 75% independent directors, an increase over the current 60%.

To ensure compliance with this statutory provision, one of the closing conditions to the transaction between TICC Management and BSP is that four new independent directors be added to TICC's board to make it more than 75% independent. Proxy at 4 (Ex. B). The transaction was also conditioned on the two TICC Management directors who currently sit on TICC's board resigning and being replaced by two directors affiliated with BSP. *Id.*

TICC's directors met with and subsequently nominated four independent directors to fill the four seats on its board that would be created should the transaction between TICC

Management and BSP be completed.  *Id.* at 30-31.  Under TICC's charter, the company's *board* is required to fill *all* vacancies, including vacancies resulting from an increase in the size of the board, unless otherwise required by the ICA.  Charter Art. V § 5.1 (Ex. G).  The ICA, in turn, provides that where, as is the case here, independent directors are added to fill vacancies on a board in connection with the 75% independence requirement, those new directors *must* be selected and proposed by a majority of the current independent directors on the board and then approved by stockholders.  *See* 15 U.S.C. § 80a-16(b).

In compliance with these provisions, the board nominated the new independent directors and submitted them for a stockholder vote.  The board also conditionally approved the two BSP-affiliated directors joining the board to replace the two TICC Management directors should the transaction go forward and the two current TICC Management directors resign.  Proxy at 9-10, 30 (Ex. B); Oct. 5, 2015 Proxy at 1 (Ex. F).

**D.  TICC announces the transaction between TICC Management and BSP and receives a competing proposal from NexPoint.**

On August 4, TICC publicly announced that BSP had agreed to acquire TICC Management and that TICC's board had approved a new investment advisory agreement with BSP.  TICC Aug. 4, 2015 Press Release (Ex. H).  One week later, NexPoint, a competitor of BSP, approached TICC's board and proposed that TICC enter into a new advisory agreement with NexPoint instead of proceeding with the BSP transaction.  Compl. ¶ 36.

Upon receiving NexPoint's proposal, TICC's board formed a special committee, consisting solely of independent directors, to evaluate its merits.  Proxy at 24 (Ex. B).  The members of the special committee all have significant investment management and research experience, and consulted with independent legal counsel.  *Id.*  On August 18, the committee asked NexPoint to provide responses to a questionnaire.  Compl. ¶ 40.  The committee assessed

NexPoint's responses and, on August 26, sent NexPoint follow-up questions, and thereafter again assessed NexPoint's response.  Oct. 9, 2015 ISS Presentation at 10 (Ex. E); Compl. ¶ 43. In all, TICC's special committee met four separate times in August to discuss and assess NexPoint's offer and the additional information it was receiving.

On August 28, TICC's special committee determined that BSP's offer was superior to NexPoint's offer and recommended that the board move forward with the new investment advisory agreement with BSP.  Oct. 9, 2015 ISS Presentation at 10 (Ex. E).  The special committee's recommendation was based on a number of factors, including:

- BSP's significant experience and resources for middle-market loan investments, on which TICC's board wanted to focus;

- NexPoint's strategy emphasizing CLOs, from which TICC's board had previously decided it would move away;

- NexPoint's lack of strong historical performance in its CLO business;

- BSP's greater access to resources and investment professionals; and

- NexPoint's lack of experience acting as an investment advisor for a company like TICC.

Proxy at 2-3, 18-19, 22-24 (Ex. B); Sept. 29, 2015 Proxy at 1-2 (Ex. I).  NexPoint's competing offer, however, allowed TICC to negotiate further concessions from BSP, including a reduction in the management fee.  TICC Sept. 3, 2015 Press Release (Ex. J).

On September 3, 2015, TICC's board distributed a proxy statement calling for a special meeting of stockholders on October 27 to approve the new investment advisory agreement with BSP and to elect the new directors nominated by TICC's board in connection with the proposed agreement.  Proxy at cover letter (Ex. B).  The proxy explained that the reason stockholders were being asked to vote in a special meeting was to ensure that the transaction satisfied the legal requirements of the ICA.  *Id.* at 13, 28, 30.  It made clear that the approval of the advisory

8

agreement and the election of directors were contingent on one another: unless stockholders approved the advisory agreement, there would be no director election and, given the conditions of BSP's agreement with TICC Management, there would be no new advisory agreement unless the nominated directors were elected. *Id.* at 9-10.

The proxy also disclosed the rationale for the board's recommendation that the stockholders approve the BSP advisory agreement, and the fact that several of the directors and officers — specifically those affiliated with TICC Management — would "receive substantial payments" in connection with the proposed transaction between TICC Management and BSP. *Id*. at 6, 22-24, 28-29. The proxy also described the terms of the unsolicited written proposal from NexPoint seeking to acquire TICC Management, and the reasons why TICC's special committee of independent directors had recommended that TICC proceed with the BSP transaction instead of that proposal. *Id.* at 24.

**E.      NexPoint puts forward an invalid slate of directors to advance its bid.**

On September 11, upon learning that the board had rejected its proposal, NexPoint, which had purchased its sole 100 shares of TICC only three weeks prior, notified TICC that it sought to nominate six directors at the October 27 special meeting. Compl. Ex. 1 at 1; Compl. ¶ 66.

TICC filed additional related proxy materials, including on September 29, October 2, and October 5. The September 29 disclosure identified that NexPoint was the third party that TICC previously disclosed had offered to replace TICC Management as TICC's investment advisor. Sept. 29, 2015 Proxy at 2 (Ex. I); Compl. ¶ 59. On October 5, TICC further disclosed that NexPoint had improperly submitted a competing slate of board candidates and disclosed a letter advising NexPoint that those candidates were not valid because — as had been previously disclosed in the proxy statement — no director election would be required or would occur if the conditions to the BSP agreement were not satisfied. Oct. 5, 2015 Proxy (Ex. F).

## ARGUMENT

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies," *Grand River Enter. Six Nations* v. *Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction thus bears the burden of showing: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Cacchillo* v. *Insmed, Inc.*, 638 F.3d 401, 405 (2d Cir. 2011). Where, as here, a party seeks a *mandatory* injunction, meaning one that would alter the status quo, the party must further "meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." *Doniger* v. *Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).[2]

## POINT I

### PLAINTIFF HAS FAILED TO SHOW
### ANY LIKELIHOOD OF SUCCESS ON THE MERITS

NexPoint's core argument is that it has a right under TICC's bylaws to have its slate of nominees on the ballot and, if they are elected, to be seated on the board. NexPoint asks for a mandatory injunction requiring that TICC go forward with the special meeting, that its nominees be on the ballot, and that its nominees be seated should they be elected by stockholders. The

---

[2] Shareholders challenging the sufficiency of a corporation's disclosures seek an injunction *preventing* a shareholder vote from proceeding until sufficient disclosure is made. Plaintiff, by contrast, is seeking an injunction *requiring* TICC to go forward with a special meeting that the board has the right to move or cancel and to compel a vote on its proposed nominees. As a result, plaintiff is seeking to significantly alter the status quo and must satisfy the heightened standard of demonstrating a "clear" or "substantial" likelihood of success on the merits that applies to mandatory injunctions.

relief NexPoint seeks is inconsistent with both federal and state law applicable to this transaction, as well as TICC's governing documents.

## A.      Federal law bars the relief NexPoint seeks.

The Investment Company Act regulates the transaction at issue and the special meeting that has been called in connection with the transaction.  As set forth in TICC's proxy statement, the BSP transaction was structured to ensure that it complied with Section 15(f) of the ICA, which was enacted in 1975 to "make clear that an investment advisor can make a profit on the sale of its business subject to two principal safeguards to protect the investment company and its shareholders."  Senate Committee Report No. 94-75 (1975) at 71.  Specifically, Section 15(f) provides that an investment advisor may derive a benefit from a change of control if (1) at least 75% of the company's board is comprised of non-interested directors for a period of three years after the transaction and (2) the transaction does not place an undue burden on the company.  *See* 15 U.S.C. § 80a-15(f).

The BSP transaction implicates Section 15(f) because the owners of TICC Management are selling their equity to BSP.  Because TICC's board is currently 60% independent, TICC's directors resolved to expand the board and add four non-interested directors if the BSP agreement is approved by TICC's stockholders in order to comply with the 75% requirement set forth in Section 15(f).  *See* Proxy at 4 (Ex. B) ("The Transaction is structured to comply with the conditions imposed under Section 15(f) of the 1940 Act.").

The ICA specifically contemplates that to comply with Section 15(f) it may be necessary to reconfigure the board.  Section 16(b) provides that vacancies on a board of directors that arise in connection with meeting the 75% requirement must satisfy two criteria.  *First*, the new directors must be nominated by the existing non-interested directors on the board.  *Second*, those nominees must be elected by the company's stockholders.

11

The full text of Section 16(b) provides as follows:

> Any vacancy on the board of directors of a registered investment company [or business development company] which occurs in connection with compliance with section 80a–15 (f)(1)(A) of this title and which must be filled by a person who is not an interested person of either party to a transaction subject to section 80a–15 (f)(1)(A) of this title shall be filled *only* by a person:
>
> > *(1) who has been selected and proposed for election by a majority of the directors of such company who are not such interested persons, and*
> >
> > (2) who has been elected by the holders of the outstanding voting securities of such company, except that in the case of the death, disqualification, or bona fide resignation of a director selected and elected pursuant to clauses (1) and (2) of this subsection (b), the vacancy created thereby may be filled as provided in subsection (a) of this section.

15 U.S.C. § 80a-16(b) (emphasis added).

Accordingly, as Section 16(b) makes clear, a vacancy on the board created in connection with complying with the 75% rule may be filled "only by a person" who *both* has approval of a majority of the current non-interested directors *and* has been elected by the company's stockholders. Contrary to plaintiff's assertions, an election called to satisfy Section 15(f) of the ICA is *not* an open election where any stockholder can put forward a slate of nominees. Election by the stockholders alone is *not* sufficient to comply with the federal statute.

In this case, NexPoint does not meet, and cannot meet, the requirements of the ICA. In its *ex parte* motion papers, NexPoint does not even reference these key provisions of federal law. None of NexPoint's proposed nominees have been "selected and proposed for election" by a majority of the non-interested directors on TICC's board. As such, these nominees are barred by federal statute from filling the vacancies created for the purpose of complying with Section 15(f). Thus, the relief NexPoint seeks — namely, a mandatory injunction requiring that its nominees be allowed to run and be seated if elected — violates Section 16(b) of the ICA. The ICA thus

disposes, by itself, of NexPoint's attempt to nominate directors to fill the four vacancies that will be created to add independent directors to the board in compliance with Section 15(f).

**B.      Maryland law and TICC's governing documents bar the relief NexPoint seeks.**

The proper application of Maryland law further establishes that NexPoint is not entitled to nominate or seat *any* of its six nominees at the upcoming election.  As a Maryland corporation, the internal affairs of TICC are governed by the Maryland General Corporation Law ("MGCL"), TICC's corporate charter, and the company's bylaws, in that order.  *McCrae Assocs.* v. *Univ. Capital Mgmt.*, 746 F. Supp. 2d 389, 399 (D. Conn. 2010).  By virtue of TICC's election in its charter to be governed by Section 3-804(c) of the MGCL, neither NexPoint nor any other stockholder has the power to nominate a director to fill *any* of the relevant board vacancies.

**1.      Pursuant to the charter and the MGCL, only TICC's board of directors may fill the director vacancies at issue.**

Pursuant to both Article V of the charter and Section 2-401 of the MGCL, the business and affairs of TICC are managed at the direction of the board.   Charter Art. V § 5.1 (Ex. G). The size of the board "may be increased or decreased only by the Board of Directors pursuant to the Bylaws." *Id*.  At present, pursuant to Article III, Section 2 of the bylaws, the board has established that the number of directors of TICC is five.  Those five directors are classified into three different classes, each with a distinct term.  *Id*.  Elections are held each year for any director whose term expires in that year.  Bylaws Art. II § 2 (Ex. C).

In its charter, TICC has elected to be subject to Section 3-804(c) of the MGCL, providing that vacancies on the board may *only* be filled by a majority vote of the *directors* then in office, unless the ICA provides otherwise:

> The Corporation elects, at such time as Subtitle 8 of Title 3 of the MGCL becomes applicable to the Corporation, that, *subject to applicable requirements of the 1940 Act . . . , any and all vacancies on the Board of Directors may be filled only by the affirmative vote of a majority of the remaining directors in office*, even

13

if the remaining directors do not constitute a quorum, and any director elected to fill a vacancy shall serve for the remainder of the full term of the directorship in which such vacancy occurred and until a successor is duly elected and qualifies.

Charter Art. V § 5.1 (Ex. G) (emphasis added).

Under Maryland law, TICC's election into Section 3-804(c) makes clear that NexPoint's purported director nominations are invalid.[3]  Section 3-804(c) provides as follows:

> (c) Vacancy. – (1) Notwithstanding any provision in the charter or bylaws, this subsection applies to a vacancy that results from:
>
>> (i) *An increase in the size of the board of directors*; or
>> (ii) The death, *resignation*, or removal of a director.
>
> (2) Each vacancy on the board of directors of a corporation may be filled *only* by the affirmative vote of a majority of the remaining directors in office, even if the remaining directors do not constitute a quorum.
>
> (3) Any director elected to fill a vacancy shall hold office:
>
>> (i) For the remainder of the full term of the class of directors in which the vacancy occurred; and
>> (ii) Until a successor is elected and qualifies.

MGCL § 3-804(c) (emphasis added).  In short, under the statute, any vacancy on the board of directors, including those that result from "an increase in the size of the board of directors," may be filled *only* by the affirmative vote of a majority of the remaining directors in office.  *See id.*

Consistent with this provision, TICC's charter, which plaintiff fails to cite, provides that vacancies may be filled *only* by a majority of the remaining directors, subject to "applicable requirements of the 1940 Act."  Charter Art. V § 5.1 (Ex. G).  As discussed in the preceding section, Section 16(b) of the ICA provides that vacancies on the board that are filled by

---

[3] This election is authorized by Section 3-802 of the MGCL, which provides that a Maryland corporation that has a class of equity securities registered under the Securities Exchange Act of 1934 and that has three directors who satisfy the independence requirements of Section 3-802(b) may elect (by way of its charter, bylaws or a director resolution) to be subject to one or more of the features of Subtitle 8 of Title 3 of the MGCL.

independent directors in connection with complying with the 75% rule set forth in Section 15(f) must be filled by nominees who are *both* proposed by a majority of the independent directors and approved by a stockholder vote.  For all other vacancies, such as those that would be created by the resignation of the two interested TICC Management representatives on the board, Maryland law and TICC's charter vest appointment of replacements solely in the hands of the board.  Thus, neither Maryland nor federal law applicable to this transaction would permit vacancies of any type to be filled by stockholder-nominated directors who are not supported by the existing board, as NexPoint seeks to do.[4]

### 2.  Plaintiff's argument under TICC's bylaws and its appeal to Delaware law are irrelevant and unsound.

Plaintiff claims that TICC's bylaws permit stockholders to nominate directors when an election is to be held.  It is blackletter corporate law that a corporation's charter is its fundamental governing document, which would prevail over any contrary provision of the bylaws.  As discussed above, TICC's charter provides that vacancies will be filled exclusively by the board and, as a result, NexPoint's argument about TICC's bylaws is irrelevant.

Even assuming plaintiff's bylaw argument is viable, it is meritless.  In another provision that plaintiff neglects to cite, TICC's bylaws provide exactly the same thing as the charter with respect to filling vacancies:  "Pursuant to the Corporation's election in Article V of the charter, subject to the applicable requirements of the Investment Company Act . . . any vacancy on the

---

[4] NexPoint's claim also fails because the action of TICC's board to add new directors is contingent on consummation of the transaction between BSP and TICC Management.  As described above, the sole reason for adding new directors to the board is to allow that transaction to comply with Section 15(f).  If the shareholders vote down the new advisory agreement with BSP, the transaction between BSP and TICC Management will not occur, and there will be no reconfiguration of the board and no vacancies to fill.  *See* Oct. 5, 2015 Proxy at 1 (Ex. F) ("[T]he Company's board of directors has also asked the Company's stockholders to vote at the Special Meeting to elect six Company-proposed director nominees to fill vacancies that will only be created effective upon, and subject to, the close of the Transaction.").

Board of Directors may be filled *only by a majority of the remaining directors.*"  Charter Art. III, § 11 (Ex. G) (emphasis added).  NexPoint's nominees cannot satisfy this director-approval requirement for the reasons discussed above.

Plaintiff also argues that TICC's board has somehow interfered with the stockholder franchise.  As shown above, the only right to vote that stockholders have in this context under governing law and TICC's charter and bylaws is the right to vote on nominees selected by a majority of the company's independent directors in accordance with Section 16(b) of the ICA. Stockholders are being permitted to exercise that right.[5]

Nor is the stockholder vote an empty right as plaintiff suggests.  As the transaction has been structured, unless a majority of stockholders approve the new advisory agreement, neither the agreement nor any of the proposed director nominees will be approved, and TICC Management's sale to BSP will not close.[6]  Thus, if stockholders do not want BSP to become their investment advisor or do not like the transaction between TICC Management and BSP, they can vote it down and the status quo will be maintained.  Plaintiff suggests that such a result would somehow "entrench" the current board.  It will not.  If this transaction fails to go forward, TICC will be in exactly the same position it would have been in had the new advisory agreement

---

[5]  Stockholders are also being afforded the right to vote on the board's nominees to fill the two interested-director seats that would become vacant on the resignation of TICC Management's representatives.  This vote is arguably not required:  under the charter, bylaws, and Maryland law, a majority of the board could have filled these vacancies, if they arise, without a shareholder vote.  And plaintiff cannot now claim that shareholders are in any way harmed by being granted a vote that was not legally required.

[6]  Section 2(a)(42) of the ICA defines a "majority of the outstanding voting securities" as the lesser of (i) 67% or more of TICC's common stock present at the special meeting, or (ii) more than 50% of TICC's outstanding common stock.

with BSP never been proposed:  the current board will remain in place, subject to election in accordance with the company's regular annual cycle.

Finally, while completely ignoring governing federal and Maryland law, plaintiff invokes the Delaware Supreme Court's decision in *Blasius Industries, Inc.* v. *Atlas Corp.*, 564 A.2d 651, 663 (Del. Ch. 1988).  But Maryland's highest court has already rejected *Blasius* as a statement of Maryland law.  *Tackney* v. *U.S. Naval Acad. Alumni Ass'n*, 408 Md. 700, 719 (2009).[7]

## C. Plaintiff's disclosure claims are baseless.

Plaintiff's federal disclosure claims likewise fail.  In order to establish a violation of Rule 14a-9, a stockholder plaintiff must demonstrate:

> (1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action.

*Vides* v. *Amelio*, 265 F. Supp. 273, 276 (S.D.N.Y. 2003).  If the stockholder plaintiff can identify a misstatement or omission in the proxy materials, it must then establish the materiality of such misstatement or omission by showing that "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976).  "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.  To be

---

[7] Plaintiff cites a Maryland trial-court decision issued by then-Circuit Court Judge Albert Matricciani in *Shaker* v. *Foxby Corp.*, 2005 WL 914385, at *5 (Md. Cir. Ct., Mar. 15, 2005). But plaintiff fails to cite his subsequent opinion that clarified that he did not adopt the holding in *Blasius* upon which plaintiff relies:  *Western Inv. Hedged Partners* v. *Sunset Fin. Res.*, 2006 WL 4639855, at *2-3 (Md. Cir. Ct., Mar. 7, 2006) ("While embracing the corporate principles established in the Delaware courts concerning the primacy of shareholder voting rights in a change of control context, *the Court stopped short of embracing the principle further enunciated in Blasius that directors' actions taken in good faith may constitute an 'unintended violation' of the duty of loyalty that the board owes to shareholders*."  (emphasis added)).

actionable under the securities laws," however, "an omission must be misleading."  *Brody* v. *Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Plaintiff's principal disclosure claim is a bootstrap of its state law claims.  Plaintiff challenges TICC's statement that "NexPoint wants you to throw your vote away by voting for their director candidates whose nomination, we believe, is invalid" and the related footnote referencing Maryland law and the "contingent nature of the proposals to be approved."  Compl. ¶ 63.  As described above, this statement is accurate.  The expansion of the board and the election of the directors are both contingent upon the closing of the TICC Management-BSP transaction.  Furthermore, director candidates must be nominated by a majority of TICC's independent directors, and because NexPoint's nominees were not so nominated, their nomination was invalid.

Federal courts, including the Second Circuit, have repeatedly rejected such attempts to bring state law causes of action "under a thin coat of federal paint."  *Koppel* v. *4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999); *Field* v. *Trump*, 850 F.2d 938, 948 (2d Cir. 1988) ("Allegations that a defendant failed to disclose facts material only to support an action for breach of state-law fiduciary duties ordinarily do not state a claim under the federal securities laws."); *see also Kas* v. *Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[P]laintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty."); *Kademian* v. *Ladish Co.*, 792 F.2d 614, 622 (7th Cir. 1986) ("[A] plaintiff may not 'bootstrap' a state law claim into a federal case by alleging" that the defendants failed "to reveal . . . their impure motives."); *see also Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals

with transactions in securities, particularly where established state policies of corporate regulation would be overridden.").

The rest of plaintiff's disclosure claims are equally meritless. *First*, plaintiff claims that the September 3, 2015 disclosure that Cohen, Royce and Rosenthal would "receive substantial payments" from the BSP-TICC Management transaction was materially misleading because it failed to specify the particular amounts each individual would receive. Compl. ¶ 52; Pl. Memo at 20. TICC has more than adequately disclosed the nature and existence of the directors' interests in the BSP-TICC Management transaction. For example, page 28 of the proxy includes the following:

> **Significant Conflicts of Interest of Our Directors and Officers in the Transaction**
>
> When you consider the recommendation of the Board of Directors that you vote to approve the New Advisory Agreement, you should be aware that certain of our executive officers and members of our Board of Directors have significant conflicts of interest in the Transaction.

Proxy at 28 (Ex. B). The proxy goes on to describe the nature of that conflict, including that Cohen, Rosenthal and Royce own or control TICC Management, and will accordingly "receive substantial payments" in connection with the BSP-TICC Management transaction. *Id*. at 28-29. Page 6 of the proxy includes similar information in response to a bold-faced question: "**Do any of the Company's directors or officers have an interest in the approval of the New Advisory Agreement that is different from that of the Company's stockholders generally?**" *Id*. at 6. These disclosures are more than sufficient to put TICC's stockholders on notice of the interested directors' personal interest, and TICC has no obligation to disclose the specific dollar amount that the individuals stand to gain in the sale transaction between TICC Management and BSP — a transaction to which TICC is not a party. *See Resnik* v. *Swartz*, 303 F.3d 147, 151 (2d Cir.

2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.  For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.").[8]

     *Second*, plaintiff alleges that TICC should have disclosed the names and qualifications of NexPoint's nominees.  But NexPoint's nominees are not valid, and, therefore, that information is not material.  *Taro Pharm. Indus., Ltd.* v. *Sun Pharm. Indus., Ltd.*, 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010) (securities laws are "not designed to force" parties to "admit the . . . underlying allegations" of their adversaries; *Sea Containers Ltd.* v. *Stena AB*, 890 F.2d 1205, 1210 (D.C. Cir. 1989) ("[I]t would hardly seem proper for the district court to order [defendant] to 'disclose' what it denies.").  In any event, NexPoint itself has filed a 63-page proxy statement and 59-slide investor presentation touting its offer and disclosing the names and qualifications of its proposed nominees.  These materials provide detailed information about (i) the proposal that plaintiff submitted to the special committee, (ii) plaintiff's concerns about the board's handling of its proposal, and (iii) plaintiff's asset management and investment advisory capabilities.  That information has thus been placed before TICC's stockholders and is already part of the total mix of information available to stockholders.  *Rodman* v. *Grant Found.*, 608 F.2d 64, 70 (2d Cir.1979) ("In determining whether [information in proxy statements] constituted full and

---

[8]  The cases cited by NexPoint are not to the contrary and, in fact, support the adequacy of TICC's disclosure.  The cases find that a Section 14(a) claim can arise where the disclosure fails to disclose the *existence* of a director's conflict of interest, or buries the facts that would put the shareholders on notice of that conflict.  *See Kas*, 796 F.2d at 513 (noting that a Section 14(a) claim is not "preclude[d]" where a proxy "fails to disclose" that management has a personal stake in the decision, and dismissing plaintiffs' Section 14(a) claim); *Gould* v. *American-Hawaiian S. S. Co.*, 535 F.2d 761, 774 (3d Cir. 1976) (holding the disclosure was deficient where it failed to explicitly disclose the director's conflict and the related facts were "scattered" and "rather buried" in the proxy).  As noted above, TICC's proxy prominently disclosed in several places the existence and nature of certain directors' conflicts of interest. Proxy at 6, 28 (Ex. B).

adequate disclosure, the district court properly took into account information already in the public domain and facts known or reasonably available to the shareholders."); *Szymborski* v. *Ormat Tech., Inc.*, 776 F. Supp. 2d 1191, 1199-1200 (D. Nev. 2011) ("Companies are under no obligation to disclose information already in the public domain.").

*Third*, plaintiff manipulates through ellipses and then challenges the statement that "[t]he Special Committee thoroughly considered the NexPoint . . . proposal[], . . . and is assisted by independent legal counsel at Wachtell, Lipton, Rosen & Katz and financial advisors at Morgan Stanley & Co. LLC." Pl. Br. at 9. Plaintiff argues that the statement suggests that these firms advised on the initial decision to reject NexPoint's proposal. But there is no such implication. The statement, on its face, is a present tense assertion that those firms were representing the special committee as of the date of the disclosure. This statement is entirely accurate. As of October 5, the committee *was* being assisted by both Wachtell Lipton and Morgan Stanley, as plaintiff also concedes. Compl. ¶ 64.

*Fourth*, plaintiff alleges that TICC failed to make disclosures about NexPoint's "strategy, reputation, institutional relationships, [and] track record," as well as TICC's alleged failure to negotiate with NexPoint. *E.g.*, Compl. ¶¶ 53-57, 59-62. That claim is baseless. TICC's September 3, 2015 proxy disclosed both the existence and key terms of NexPoint's unsolicited offer to become TICC's investment advisor as follows:

> The Board of Directors formed a special committee consisting solely of the Company's three Non-interested Directors (the "Special Committee") to evaluate an unsolicited, written proposal from a third party also seeking to replace [TICC Management] as the investment adviser to the Company. The third party offered a 50% reduction in the base management fee under a new investment advisory agreement for a period of three years and to waive the first $5 million of the management fee. In addition, the third party included a commitment to purchase $10 million of the Company's common stock in one or more open-market purchases. The third party subsequently offered to further extend its proposed 50% reduction in the base management fee under a new investment advisory

agreement for an additional year and provide an additional $20 million of fee concessions or share purchases.

Proxy at 24 (Ex. B).  TICC truthfully disclosed the extent of its interactions with NexPoint following the submission of its offer.  And TICC disclosed the reasons the special committee and the board recommended that TICC's stockholders approve BSP's offer, including:

- BSP's "substantially similar strategy to the anticipated new investment strategy of [TICC];" *id.* at 18;

- BSP's "extensive, nationwide network of senior partner relationships, CEO relationships, key financial intermediaries, financial sponsors and the extensive global resources and networks of the broader Providence platform" which will provide "additional resources in origination, underwriting and portfolio management;" *id.* at 2-3;

- The experience of BSP's senior management team; *id.* at 3, 18; and

- The expansion of investment opportunities for TICC, including through co-investing with other BSP-affiliated funds; *id.*

No further information was required.  The securities laws do not require TICC to supply information about some third party's "reputation" or "strategy."  If NexPoint wants to supply TICC's stockholders with that information, it is free to do so, provided its disclosures are truthful.  Indeed, in its 63-page proxy statement, which has been posted on TICC's website, NexPoint provides detailed information about its alleged advisory capabilities and its offer to become TICC's investment advisor.  *Id.*  TICC has no obligation to disclose more than it already has.  *See Koppel* v. *4987 Corp.*, 167 F.3d 125, 134 (2d Cir. 1999) ("The securities laws do not "effectively require [an issuer] to accuse [it]sel[f] of breach of fiduciary duty.").

**D.**    **Considerations of subject matter jurisdiction and comity weigh heavily against a Connecticut federal court issuing an injunction under Maryland corporate law.**

There can be no dispute that the core injunctive relief that plaintiff is seeking is only potentially available under Maryland corporate law.  The federal claims provide no basis to require a vote or allow plaintiff's nominees to run for election or be seated on TICC's board.

But the sole basis for jurisdiction over those state-law claims is supplemental jurisdiction under 28 U.S.C § 1367 based on plaintiff's assertion of federal disclosure claims.  As shown above, those federal claims are themselves largely premised on alleged violations of state law.

The Supreme Court has clearly directed federal courts to exercise restraint in the face of such attempts to manufacture federal jurisdiction.  As the Court explained, "recognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's effort to impose upon it what is in effect only a state law case.  Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed."  *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 727 (1966); 28 U.S.C. § 1367(c) (expressly authorizing district court to "decline to exercise supplemental jurisdiction" over a state-law claim over which it has no independent jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction").

Consistent with that directive, lower courts have dismissed cases like this one where it is apparent that the core of plaintiff's complaint is a state-law controversy.  *See, e.g.*, *Lemon Bay Partners LLP* v. *Hammonds*, 2007 WL 1830899, at *5 (D. Del. June 26, 2007) (declining to exercise supplemental jurisdiction where Delaware corporate fiduciary claims substantially predominated over the federal securities claim); *Merritt* v. *Colonial Foods, Inc.*, 499 F. Supp. 910, 915 (D. Del. 1980) (dismissing action in which four state law claims predominated over one federal 10(b) claim that was employed merely to create federal jurisdiction); *De Asencio* v.

*Tyson Foods, Inc.*, 342 F.3d 301, 307-12 (3d Cir. 2003) (state law claims substantially predominated over the federal claims).[9]

Plaintiff's contrived attempt to litigate these Maryland-law questions in federal court is particularly improper because federal courts have been reluctant to interfere with the internal affairs of out-of-state corporations. It "has long been settled doctrine that a court — state or federal — sitting in one state will, as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile." *Rogers* v. *Guar. Trust Co. of New York*, 288 U.S. 123, 130 (1933). As Judge Learned Hand explained: "when a trial involve[s] the internal affairs of a corporation, the rule is that the courts of a foreign forum will not assume jurisdiction over it." *Weiss* v. *Routh*, 149 F.2d 193, 195 (2d Cir. 1945) (dismissing claim against Virginia corporation; "Judgment reversed; complaint dismissed; not on the merits, but because the district court should have refused to entertain the action").

Under these settled principles, this Court can and should decline to issue an injunction on plaintiff's Maryland-law claims. Indeed, if anything, the proceedings before this Court illustrate the need for restraint in exercising jurisdiction over state-law claims involving the internal affairs of a corporation incorporated in another state. Plaintiff has chosen to proceed here on an *ex parte* basis on an incredibly compressed timeframe without so much as disclosing the governing provisions of Maryland law. If plaintiff wanted an injunction under Maryland law, it could have and should have proceeded in the Maryland courts.

---

[9]  *See also Grace* v. *Rosenstock*, 228 F.3d 40, 55 (2d Cir. 2000) ("[W]e are disinclined to remand for the court to exercise pendent jurisdiction over this state-law claim because all of the federal claims have now been dismissed."); *Vandiver* v. *Hardin Cnty. Bd. of Educ.*, 925 F.2d 927, 935 (6th Cir. 1991) ("A federal court should 'avoid needless decisions of state law . . . both as a matter of comity and to promote justice between the parties for procuring for them a more sure-footed reading of applicable law.'").

## POINT II

## PLAINTIFF HAS FAILED TO SATISFY ANY OF THE
## EQUITABLE ELEMENTS FOR OBTAINING A PRELIMINARY INJUNCTION

**A.      Plaintiff cannot show a threat of irreparable harm.**

NexPoint has no claim that it will suffer irreparable harm.  Plaintiff's argument is that it is being deprived of its right to have its nominees elected to the TICC board.  But under the ICA, Maryland law, and TICC's charter, NexPoint's nominees are barred from being seated on the board because they are not supported by TICC's directors.  NexPoint is not being harmed because it is not being deprived of any right.  *See, e.g.*, *Kellner* v. *U.S. Army Corps. of Engineers*, 2014 WL 753927, at *2 (S.D.N.Y. Feb. 26, 2014) (holding that plaintiff would suffer no irreparable harm in the demolishing of an access ramp because plaintiff had no rights with respect to the proposed demolition); *Bowen* v. *Goldstein*, 2007 WL 4457242, at *4 (S.D.N.Y. Dec. 13, 2007) (holding that plaintiff failed to prove irreparable harm from defendant's policy of prohibiting access to computer resources because plaintiff had no right to use such resources).

**B.      The balance of the equities weighs heavily against an injunction.**

The balance of the equities also weighs heavily against granting NexPoint injunctive relief.  TICC has negotiated a favorable investment advisory agreement with BSP that has been reviewed and approved by TICC's board, including its three independent directors.  The new advisory agreement is conditioned on TICC stockholder approval and on the election of four new non-interested directors to TICC's board in order to comply with Section 15(f) of the ICA.  If any of NexPoint's directors are required by Court order to be seated on the board, even if the TICC stockholders vote to approve the agreement, BSP would still have the right to terminate, and TICC stockholders could lose the benefit of the deal.  Proxy at 4 (Ex. B).

By contrast, NexPoint is seeking this injunction to advance its private interests as a competitor of BSP. Despite trying to cloak its claims in rhetoric about the stockholder franchise, in truth, NexPoint is just an investment advisor that wants to interfere with a competitor's deal and obtain new business for itself. NexPoint is free to argue to TICC's stockholders that they should vote down the BSP advisory agreement because it is less favorable than the deal that NexPoint is proposing. It is likewise free to challenge TICC's incumbent directors at the company's next annual meeting. But it may not contravene the ICA, Maryland law, or TICC's charter in order to pursue its own business interests. The balance of the equities thus weighs heavily against injunctive relief.

**C.**    **The injunction plaintiff seeks would be against public policy.**

Public policy strongly weighs against granting the mandatory injunction that NexPoint seeks in these circumstances. NexPoint is a competitor of TICC Management and an interloper seeking to gain control of TICC's board by making a *de minimis* investment and purporting to assert stockholder rights that do not exist, while disrupting a heavily negotiated transaction that has been deemed by the duly elected members of TICC's board to be in the best interests of TICC's stockholders. The TICC stockholders should be allowed to vote on that proposal without disruption or distraction. NexPoint has pursued a theory that contravenes controlling federal law to advance its own business interests, and the injunction it seeks is not in the public interest.

## CONCLUSION

For all of the foregoing reasons, the TRO should be dissolved and plaintiff's request for a preliminary injunction should be denied.

Respectfully submitted,

OF COUNSEL

By: /s/ Alfred U. Pavlis

Stephen R. DiPrima (*pro hac forthcoming*)
Graham W. Meli (*pro hac forthcoming*)
Benjamin D. Klein (*pro hac forthcoming*)
Courtney L. Heavey (*pro hac forthcoming*)
WACHTELL, LIPTON, ROSEN, & KATZ
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
51 West 52nd Street
New York, New York  10019
E-mail: SRDiPrima@wlrk.com
           GWMeli@wlrk.com
           BDKlein@wlrk.com
           CLHeavey@wlrk.com

*Attorneys for Defendants Steven P. Novak,
G. Peter O'Brien, and Tonia L. Pankopf*

Alfred U. Pavlis (ct08603)
Harold B. Finn III (ct08480)
Tony Miodonka (ct28262)
FINN DIXON & HERLING LLP
177 Broad Street, 15th Floor
Stamford, CT  06901-2689
Telephone: (203) 325-5000
Facsimile: (203) 325-5001
E-mail: apavlis@fdh.com
           hfinn@fdh.com
           tmiodonka@fdh.com

*Attorneys for Defendants TICC Capital
Corp., Jonathan H. Cohen, Charles M.
Royce, Steven P. Novak, G. Peter O'Brien,
Tonia L. Pankopf, and Saul B. Rosenthal*

Todd M. Reinecker (*pro hac forthcoming*)
Scott R. Wilson (*pro hac forthcoming*)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, MD 21202
Telephone: (410) 385-3501
E-mail: treinecker@milesstockbridge.com
           swilson@milesstockbridge.com

*Attorneys for Defendants TICC Capital
Corp., Jonathan H. Cohen, Charles M.
Royce, Steven P. Novak, G. Peter O'Brien,
Tonia L. Pankopf, and Saul B. Rosenthal*

Dated:  October 13, 2015

## CERTIFICATION

I hereby certify that on October 13, 2015, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ Alfred U. Pavlis
Alfred U. Pavlis (ct08603)
FINN DIXON & HERLING LLP
177 Broad Street, 15th Floor
Stamford, Connecticut  06901-2048
Tel: (203) 325-5000
Facsimile:  (203) 325-5001
E-mail: apavlis@fdh.com