# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

NEXPOINT ADVISORS, L.P.,

        Plaintiff,

  v.

TICC CAPITAL CORP., JONATHAN H. COHEN, CHARLES M. ROYCE, STEVEN P. NOVAK, G. PETER O'BRIEN, TONIA L. PANKOPF, AND SAUL B. ROSENTHAL,

        Defendants.

Civil Action No.
3:15-cv-1465 (CSH)

**NOVEMBER 25, 2015**

## <u>RULING ON PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION</u>

**HAIGHT, Senior District Judge:**

In a decision reported at 2015 WL 6408117 (D.Conn. Oct. 23, 2015) ("the October 23 Ruling"), the Court denied in part and granted in part Plaintiff NexPoint Advisors, L.P's ("NexPoint") motion for a preliminary injunction. This decision resolves Plaintiff's motion for partial reconsideration. Doc. 62.

### I

Familiarity with the October 23 Ruling is assumed. The facts and circumstances recited therein are not recounted here. For present purposes, it is sufficient to say that the October 23 Ruling granted NexPoint's motion insofar as it enjoined Defendant TICC Capital Corp. ("TICC") to issue a proxy statement clarifying and correcting certain false or misleading statements contained in an earlier proxy statement TICC addressed to its stockholders with respect to a proposed special

1

meeting of the stockholders (the "Special Meeting"). The declared purposes of the Special Meeting were to vote upon the proposed acquisition of a TICC affiliate, TICC Management, by Benefit Street Partners L.L.C. ("BSP"), and the election of TICC directors in connection with that transaction. The Court held in the October 23 Ruling that certain statements in TICC's earlier proxy statement, soliciting stockholder approval of the transaction at the Special Meeting, violated section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n.

The October 23 Ruling denied NexPoint's motion insofar as it sought to enjoin TICC to include at the Special Meeting a slate of directors nominated by NexPoint, in opposition to directors nominated by TICC, and to allow the stockholders to vote on those opposing slates of nominees as an item of business at the Special Meeting. NexPoint, a TICC stockholder by virtue of an August 2015 purchase of 100 of the company's shares, based its request for that particular injunctive relief upon rights it contends says are conferred upon TICC stockholders by Maryland law, applicable to the case because TICC is a Maryland corporation.

The consequences of the Court's October 23 Ruling were that TICC was required to issue a supplemental and corrective proxy statement, and once having done so, TICC would be enabled to proceed with the Special Meeting, without the inclusion of a slate of directors nominated by NexPoint. During the interim, TICC was enjoined from proceeding with the Special Meeting.

NexPoint's present motion for reconsideration focuses upon the election of directors at the Special Meeting. The motion recites a list of perceived errors the Court committed in the October 23 Ruling on that aspect of the case. One of these is of sufficient substance to require further discussion. That issue relates to the effect of Maryland law upon the rights and obligations of the parties with respect to election of TICC directors at the Special Meeting of TICC stockholders.

2

Plaintiff and Defendants both want that meeting to take place. This action involves their disputes about how the meeting should be conducted.

II

NexPoint's theory of the case is that the law of a company's state of incorporation governs the rights and obligations of a corporation's officers and directors on the one hand, and its stockholders on the other. Typically those rights and obligations are expressed in a corporation's by-laws and charter. This case is no exception. I am asked to consider various provisions in TICC's by-laws and corporate charter.

The proper interpretation of a corporation's by-laws and charter present questions of state law (including the common law as declared by courts of the state): Maryland law in this case, TICC being incorporated in Maryland. Those questions may also be impacted by pertinent statutes enacted by the legislature of the state of incorporation. This is also such a case. I am asked to consider the effect upon TICC's bylaws and charter of that statute known as the Maryland Unsolicited Takeover Act of 1999, described by one commentator as "by far the most potent antitakeover statute that has appeared to date." Guhan Subramanian, *The Influence of Antitakeover Statutes on Incorporation Choice*, 150 U. Pa. L. Rev. 1795, 1801 (2002).[1]

NexPoint's complaint against TICC and certain individuals asserts as its fourth cause of action a claim for breach of contract under Maryland law. Doc. 1. The complaint alleges at ¶ 108: "The elements of a breach of contract claim under Maryland common law are the existence of a contractual obligation owed by the defendant to the plaintiff, a breach of that obligation, and

---

[1] At the time Mr. Subramanian wrote the article cited in text, he was an assistant professor of business administration at the Harvard Business School, with a J.D. degree from Harvard Law School and an M.B.A. degree from Harvard Business School.

damages." NexPoint's theory of the case, expressed in its first brief, is that "defendants' attempt to

invalidate NexPoint's nominees and prevent stockholders from voting on a competing slate of

directors constitutes a violation of the TICC Bylaws." Doc. 2-1, at 15. Specifically, NexPoint

contends:

> Article II, Section 11(b)(iii) of the TICC Bylaws contractually
> obligates TICC's directors and officers to recognize board candidates
> duly noticed by stockholders at special meetings where director
> elections are held. Defendants have not disputed that there will be
> board elections at the Special Meeting, and that NexPoint duly
> noticed its board nominees. Defendants' assertions that they will not
> put NexPoint's board candidates on the ballot at the Special Meeting,
> will not count proxies cast in favor of those candidates, and will not
> seat those candidates if a plurality of votes are cast for them thus
> anticipatorily breach their contractual obligations under Article II,
> Section 11(b)(iii).

*Id*. (internal citation omitted).

As noted *infra*, the Defendants take an entirely different view of Maryland law as it applies

to the conduct of the parties. The October 23 Ruling stated that, in the view the Court took of the

case, "the Court need not resolve these contentions of Maryland law." 2015 WL 6408117, at *6 n.4.

NexPoint is forcefully (if respectfully) critical of that approach, and argues in its reconsideration

motion that the Court "committed legal error" by issuing a ruling which "fails to consider whether

Maryland law and the TICC Bylaws permit defendants to create a contingent election of directors."

Doc. 62-1, at 3. NexPoint condemns the Court's conclusion that it "did not need to address issues

of Maryland law or the TICC Bylaws," in a case in which the "validity of the purported contingency

is a threshold issue that cannot be avoided," *id.*, an issue governed by Maryland law.

Counsel for Defendants find no fault with the Court's October 23 Ruling. They urge that

NexPoint's motion for reconsideration should be denied summarily, so that TICC can get on with

its corporate life, by which counsel mean holding the Special Meeting in the manner Defendants specify in the notice of meeting. However, upon further consideration – or, one should probably say, reconsideration – I conclude that the Court should take Maryland law into account in determining whether NexPoint has made a sufficient showing to obtain a preliminary mandatory injunction. NexPoint's motion for reconsideration is granted to that extent.

Defendants' argument *contra* is that the wording of § 16(b) of the federal Investment Company Act ("ICA"), 15 U.S.C. § 80a-16(b), forecloses any application of state law that would entitle stockholders to nominate a competing slate of directors in an election called by a corporation to facilitate a transaction under the "safe harbor" provisions of § 15 of the ICA. NexPoint responds that such an interpretation of the ICA would be outrageously wrong and "unprecedented," by which counsel mean that no prior court decision has given § 16(b) that preclusive effect in factual circumstances comparable to those at bar. Nor, it would seem, has any court declined to do so in such circumstances. The wording of the ICA does not include language explicitly addressing the issue. The diametrically opposed interpretations presented by the parties at bar are based upon nuances, perceived public policy, and appeals to those familiar allies of advocates, "plain language" and "common sense," whose appearances on the battlements of litigation can sometimes prove elusive.

On this particular point, the Court's most recent memorandum directed the parties to file supplemental briefs discussing an SEC Release Notice the Court's research had discovered. Doc. 82. The SEC Release Notice said, in announcing amendments to ICA exemptive rules arguably similar to those in the previously enacted § 16(b): "These amendments are not intended to supplant or limit the ability of fund shareholders *under state law* to nominate independent directors." 2001

WL 6738, at *5 (emphasis added).  Counsel's responses were predictable.  The brief for NexPoint says that "the SEC Release Notice further shows that Sections 15(f) and 16(b) [of the ICA] do not preclude TICC stockholders from nominating board candidates at the Special Meeting."  Doc. 84, at 1.  The brief for TICC says that the quoted language from the SEC Release Notice is irrelevant to the questions decided by the Court in the October 23 Ruling; or, if relevant, the release is "entirely consistent with the Court's decision" [Doc. 85], at 1; and, in any event, "there is nothing that the SEC purported to do, or could do, that would allow the Court to disregard the express requirements of the ICA," since the Supreme Court has held that "no deference is due to agency interpretations at odds with the plain language of the statute itself." *Id*. at 6 (citation omitted).

One cannot quarrel with the proposition that a regulatory agency (such as the SEC) cannot rewrite a statute it is tasked with administering (such as the ICA), thereby making the statute say something quite different from what Congress enacted.  But it is not clear beyond all rational debate that the SEC's quoted expressed intention – that the ICA exemptive rule amendments neither supplant nor limit a stockholder's ability to nominate independent directors if that ability is conferred *under state law* – is at odds with § 16(b) of the ICA, which contains no explicit reference to stockholder rights created by state law.  I may take note of what the SEC Release Notice says on that score without ceding an impermissible measure of deference to the agency.  The SEC's quoted expression is not determinative of any issue in this case.  It is simply some indication that NexPoint's non-textual interpretation of ICA § 16(b) should not be disregarded entirely.

It is perhaps useful to compare this case to a popular outdoor game from a gentler age:  lawn croquet.  A formation of metal wickets are displayed on a stretch of lawn with a wooden stake at the end.  A player wins the game by being the first to drive a wooden ball with a mallet though each of

the wickets and hit the stake.  The stake is guarded by the last two wickets, which are in front of the stake, in line with each other, and separated by a considerable distance.  To win the prize, a player must drive his or her ball through the first of these two wickets, and *then* drive the ball though the second wicket, and *then* drive the ball so that it hits the stake.

We may think of the stake in this energetically contested litigation as the mandatory preliminary injunction NexPoint seeks, which would require TICC to include NexPoint's slate of directors at the Special Meeting election, count votes or proxies in their favor, and install them as directors if they win, whether or not the TICC stockholders approve the new advisory agreement with BSP.  Two wickets are aligned on the way to that stake:  the ICA wicket and the Maryland Law wicket.  NexPoint must drive its ball though each of them:  through the ICA wicket by showing that the ICA does not preclude NexPoint from nominating and electing directors under state law; and through the Maryland Law wicket by showing that Maryland law gives NexPoint the right to nominate and elect TICC directors at the Special Meeting.

NexPoint must drive its litigation ball through both wickets to reach the preliminary injunction stake.  That is to say:  NexPoint's preliminary injunction motion fails, even if its ball safely passes though the ICA wicket, if thereafter NexPoint cannot move its ball through the Maryland Law wicket.  Upon reconsideration, I am persuaded that in declining to consider Maryland law at all, the October 23 Ruling was deficient.  The better course on the underlying preliminary injunction motion is to consider whether Maryland law gives NexPoint the right to nominate and elect TICC directors at the Special Meeting, whatever the proper conclusion may be on whether the ICA precludes the effort.

### III

NexPoint bases its breach of contract claim on the allegation that the TICC officers and directors breached a contractual obligation found in Article II, Section 11(b)(iii) of the TICC corporate bylaws by refusing to recognize a slate of directors nominated by NexPoint for election at the Special Meeting.

TICC responds by invoking the Maryland Unsolicited Takeover Act, Md. Gen. Corp. Law ("MGCL") § 3-804.  This act, known popularly (at least in some circles) as "the anti-takeover statute," provides in § 3-804(b) that "notwithstanding any provision in the charter or bylaws, the number of directors of a corporation shall be fixed only by vote of the board of directors."  Section 3-804(c) provides in pertinent part:

> (1) Notwithstanding any provision in the charter or bylaw, this subsection applies to a vacancy that results from:
>
>> (i) An increase in the size of the board of directors; or
>
>> (ii) The death, resignation, or removal of a director.
>
> (2) Each vacancy on the board of directors of a corporation may be filled only by the affirmative vote of a majority of the remaining directors in office, even if the remaining directors do not constitute a quorum.

MGCL § 3-804 is an optional statute in Maryland, in the sense that a Maryland corporation can choose whether or not to be subject to its provisions.  TICC elected in its charter to be governed by the anti-takeover statute.  Its corporate charter, at Article V § 5.1., adopts and repeats the language of the statute.

The argument TICC makes with respect to this statute's effect upon the case at bar is straightforward.  Its most recent brief says:  "NexPoint has no right under Maryland law to by-pass

8

TICC's board and elect directors who the TICC directors affirmatively oppose." Doc. 85, at 9. That is so, the argument continues, because "Maryland law prohibits NexPoint from filling board vacancies over the board's objection." *Id*. The pertinent provision in Maryland law is found in MGCL § 3-804(c), which TICC's brief contends

> unequivocally *requires* the Company's *directors* – not its stockholders – to fill all vacancies, including any vacancies that occur in connection with increasing the size of the board. Filling vacancies is not merely a board prerogative – it is a mandatory statutory obligation imposed on the directors. The relevant provision of the anti-takeover statute states: "Notwithstanding any provision in the charter or bylaws, this subsection applies to a vacancy that results from: (i) An increase in the size of the board of directors . . . Each vacancy on the board . . . may be filled *only* by the affirmative vote of a majority of the remaining directors in office." MGCL § 3-804(c) (emphasis added).

*Id*. (internal citations omitted).

While NexPoint arrays itself in the armor of a champion of TICC stockholders' rights, it clearly covets TICC's seemingly lucrative business as an investment adviser, and seeks by its opposing slate of director nominees to take over TICC. This is the sort of attempted corporate takeover the Maryland legislature addressed in the Unsolicited Takeover Act, of which § 3-804(c) forms a part. At first blush, even at second, it would appear that the preliminary injunction NexPoint seeks with respect to the nomination and election of TICC directors at the Special Meeting would, if granted, violate the strictures of Maryland's anti-takeover statute.

NexPoint seeks to avoid this impact of § 3-804(c) by drawing a distinction between present directors filling board vacancies by appointment and by calling an election pursuant to the corporate bylaws for the purpose. Its argument on the point is recapitulated in a recent brief, [Doc. 77], at 5:

> [D]efendants' argument that Section 3-804(c) and the TICC corporate

9

> charter give directors exclusive authority to "fill" board vacancies is
> a red herring. As NexPoint has explained: "[T]hey say the Maryland
> anti-takeover provision requires that the directors fill vacancies. We
> agree. How they fill those vacancies is left to the board. This board
> chose to call elections." Tr. 57. As NexPoint has further explained,
> that defendants could have filled vacancies by appointment does not
> mean that defendants may rig the elections they called for when they
> decided to qualify for the [ICA] Section 15(f) safe harbor.

NexPoint's contention, in sum, is that when TICC gave initial notice of an election of directors at the Special Meeting, before any takeover aspirant had appeared on the scene, it locked itself into a general election and abandoned, as a matter of Maryland law, the protection the state's anti-takeover statute might otherwise have given TICC and its sitting directors, suddenly and unexpectedly confronted by NexPoint's unsolicited (and manifestly unwelcome) takeover campaign.

The contentions of counsel pose an interesting question of Maryland law. NexPoint must prevail on the point in order to pass through the Maryland Law wicket and arrive at the preliminary injunction stake. Moreover, NexPoint is seeking a mandatory preliminary injunction, and is required to make "a clear showing that the moving party is entitled to the relief requested." October 23 Ruling, 2015 WL 6408117, at *5 (citing and quoting Second Circuit cases). But NexPoint cites no Maryland cases, academic commentary or other authority to support its interpretation of Maryland law in this area.[2] The limited effect NexPoint gives to the anti-takeover statute is the *ipse dixit* of gifted advocates: no less, but no more. NexPoint's interpretation of Maryland law is unsupported by any decisions by Maryland appellate courts, and is arguably in conflict with the legislature's anti-

---

[2] Nor did Plaintiffs proffer testimony of Maryland counsel—via affidavit or otherwise—to establish its contention that Maryland law controls the outcome of this case as it sees it.

takeover policy as manifested in the statute.[3]

In these circumstances, I am unable to conclude that NexPoint has made a clear showing that Maryland law favors, or at least does not preclude, the relief NexPoint seeks in its preliminary injunction. The result is that NexPoint's motion for reconsideration is granted, to the extent that the Court declined to take Maryland law into consideration. Having now done so, and for the reasons stated, the Court adheres to the October 23 Ruling, denying a preliminary injunction with respect to the election of TICC directors.[4]

---

[3]   Irrespective of the anti-takeover statute, NexPoint also argues that the "contingent" (NexPoint reads: "rigged") election TICC established for the Special Meeting violates Maryland common law as established in the Delaware case, *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988). *Blasius* stands for the principle that directors can violate the duty of loyalty if they encroach on the shareholder franchise, even if in good faith. The parties argued at length as to the impact of *Blasius* on the present facts. Regardless of its relevance to the present dispute, TICC argues that it has no application in Maryland. Doc. 24, at 17. For its part, NexPoint freely admits that the "Maryland Court of Appeals has not formally adopted the *Blasius* standard." Doc. 2-1, at 22. It argues instead that its *principles* apply in Maryland, that "it has not been rejected by Maryland courts [and] has been cited in many, many places," [Doc. 49], at 41, and that TICC has not "explained why Maryland courts would or should reject *Blasius* in favor of a doctrine permitting directors and officers to interfere with the stockholder franchise," [Doc. 33], at 7. The Court has reviewed the "many, many" Maryland cases mentioning *Blasius* (the Court only counts four such cases, one of which is a federal district case and only one of which is a state appellate case). It is far from clear that *Blasius* is the law of Maryland. *See, e.g., Tackney v. U.S. Naval Academy Alumni Ass'n*, 408 Md. 700, 718-719 (2009) (referring to appellants' citation to *Blasius* as "rel[iance] . . . on Delaware law" and, in dicta, distinguishing *Blasius* on its facts). Also of note, and as discussed above, Maryland has opted for "by far the most potent antitakeover statute," Subramanian, 150 U. Pa. L. Rev. at 1801, and thereby gives more power to boards of directors to fill vacancies than Delaware's analogous statute. *Compare* MGCL § 3-804(c) (the board must fill vacancies "[n]otwithstanding any provision in the charter or bylaws") *with* 8 Del. C. 223 (vacancies are filled by a majority of the board "[u]nless otherwise provided in the certificate of incorporation or bylaws."). NexPoint has not made the type of clear showing demonstrating that *Blasius* applies in Maryland, nor that it does so to an extent that would require the mandatory preliminary injunction it seeks. NexPoint simply has not supported its contention that *Maryland* law precludes the format of TICC's proffered election.

[4]   Although the issue is not squarely raised by the motion for reconsideration, I reach the same conclusion with respect to the related but separate question of whether the ICA precludes the

I have also considered NexPoint's other submissions in support of its motion for reconsideration. They are without substance as a basis for reconsideration and require no discussion.

**IV**

The second subject raised by the most recent submissions is the text of a proxy statement supplement TICC must send to its stockholders, in order to lift the Court's present injunction barring the Special Meeting. Disputes on that aspect of the case were foretold by the October 23 Ruling, which required counsel for TICC to send a draft of the proposed language to counsel for NexPoint to see if those counsel had any comments. They did, and have submitted a draft of their own.

It now falls to the Court to decide what the proxy statement supplement must say and what it will not be allowed to say. The following discussion tracks and is based upon the particular statements in the original proxy statement which the Court held in the October 23 Ruling violated section 14(a) of the 1934 Exchange Act.

1. Annexes One and Two to this Ruling contain instructions for the contents of the proxy statement supplement to be sent to stockholders. Annex One is the draft submitted on behalf of TICC. Annex Two is the draft submitted on behalf of NexPoint. The Court has marked up these drafts to indicate what the final version must contain. The mark-ups consist of brackets designated by letters, thus **[A .... A]**, handwritten marginal notes, and the drawing of lines through texts to be deleted.

2. The Court could not accept either draft presented by counsel. The proxy statement

_____

participation of NexPoint's prayed-for stockholder-nominated slate of directors in this section 15(f) safe harbor proceeding. As stated in prior rulings, this appears to be an open question in the Second Circuit and Supreme Court. NexPoint has not made the clear showing that its interpretation is correct that is required to entitle NexPoint to a mandatory preliminary injunction.

supplement in its final form will purport to be declarations of present TICC officers and directors addressed to TICC stockholders.  The submitted drafts were written by the trial attorneys in the case. It is asking too much of counsel to resist the temptation to place positive words (explanatory, exculpatory, placatory) in the mouths of those you represent, and negative words (confessional, self-incriminating, self- deprecatory) in the mouths of those your client is suing, even though the words in question have little or nothing to do with the particular proxy statement whose imperfections are at issue.

3.   The Court's purpose in this exercise is to strip the parties' proposed proxy statement supplements of these excesses, and present to the stockholders an accurate, neutral and unimpassioned recitation of important facts (albeit seemingly from the mouths and minds of TICC officers and directors).  It must be recalled that as the date of the Special Meeting approaches, both sides are at liberty to extend the proxy war with additional and more partisan statements (so long as they do not violate the securities laws).

4.   Once the proxy statement supplement in its Court-approved form has been sent to stockholders, TICC may reschedule the Special Meeting, on a date not earlier than two weeks from the date on which stockholders may be expected to have received the proxy statement supplement.

The Court now sets forth its instructions with respect to the contents of the proxy statement supplement TICC must send to its stockholders.

*  The document begins with that portion of Annex One enclosed within the brackets marked "A."

*  The document continues with that portion of Annex Two enclosed within brackets marked "B," as amended by the handwritten additions and deletions.

13

\*   The first proxy statement disclosure the Court held was inadequate related to the benefits to be received by Cohen, Royce and Rosenthal if the BSP Transaction was consummated.  *See* 2015 WL 6408117, at \*9.  The Court has rewritten that disclosure in its entirety.  The following language in boldface must appear next in the supplement.  That boldfaced text reflects the Court's rulings on the arguments of counsel, in briefs and at oral argument, that addressed this subject.

### Benefits to be Received by TICC directors and officers Cohen, Royce and Rosenthal, if the BSP Transaction is Completed

**In the September 3, 2015 proxy statement, we disclosed that Jonathan Cohen, the Company's CEO and member of the Company's Board of Directors; Charles Royce, the Chairman of the Company's Board of Directors; and Saul Rosenthal, the Company's President, stand to "receive substantial payments" if the BSP Transaction is completed.  As that proxy statement noted, that disclosure was made to make stockholders aware "that certain of our executive officers and directors have significant conflicts of interest in the Transaction."**

**The Court held that this disclosure was inadequate.  In October 27, 2015 proxy materials  we further disclosed that if the Transaction closes, Cohen, Royce and Rosenthal will earn "(i) a 24.9% economic interest in the BSP Affiliate," which they can sell to BSP in two years after the Transaction closes, and "(ii) the potential for a cash distribution of up to $10 million."**

**The Court again held that the disclosure on this subject was inadequate.  We now disclose that Cohen, Royce and Rosenthal currently own 100% of the current TICC investment advisor.  With respect to the new investment advisor if the Transaction is completed, the 24.9% aggregate equity interest these three individuals will receive will be distributed on the basis of 40% to Cohen, 40% to Rosenthal, and 20% to Royce.  Two years later, Cohen, Royce and Rosenthal have the right to sell their equity interests to BSP for cash at the then prevailing market value.  In 2014, the management fees received by the present TICC investment advisor totaled $21 million.**

**The additional cash distribution that Cohen, Royce and Rosenthal will receive if the Transaction is completed will be generated by the new investment advisor's ability to go out in the market and raise debt, with 50% of the borrowed money going to these three individuals, up to an aggregate cap of $10 million (the precise amount distributed to these individuals depending upon the total amount the advisor borrows).  If efforts to borrow funds**

are unsuccessful,  there will be no cash distributions from that potential source.[5]

*   Following this boldfaced passage, the proxy statement supplement continues with that portion of Annex Two enclosed within the brackets marked "C," as amended by hand.

*   The supplement continues with that portion of Annex Two enclosed within the brackets marked "D," followed immediately by that portion of Annex One within the brackets marked "E," as amended by hand.

The proxy statement supplement will take the form mandated by these instructions.  Its text will then be regarded as complete.  No alterations, amendments or additions are permitted.

If Defendants desire to proceed with the previously noticed Special Meeting, TICC must send to each stockholder of record a copy of the proxy statement supplement.  When that has been accomplished, Defendants are directed to  file and serve upon Plaintiff copies of the proxy statement supplement as transmitted to stockholders, proof of that transmission, and a calculation of the date by which all stockholders may reasonably be expected to have received the supplement.  Defendants may re-notice and re-schedule the Special Meeting, on a date not earlier than fourteen (14) calendar days after that calculated date of receipt.

## V

For the foregoing reasons, the Court makes this Order:

1.  For the foregoing reasons, the Plaintiff's motion [Doc. 62] for reconsideration of the Court's prior Ruling [Doc. 59], granting in part and denying in part Plaintiff's motion [Doc. 2] for a preliminary injunction, is GRANTED IN PART and DENIED IN PART.

---

[5]   The recitations in this boldfaced section are based upon the representations of counsel at a hearing on November 13, 2015, Tr. 82-113.

2.  Upon reconsideration, the Court amends the bases for its prior Ruling, so as to include a consideration of Maryland law and related issues.  Having made that consideration, the Court ADHERES to its prior Ruling [Doc. 59].

4.  If Defendants wish to proceed with a Special Meeting of the TICC stockholders, the corporation must send to all stockholders of record a proxy statement supplement in a form which complies with this Ruling.

5.  To vacate the preliminary injunction currently in force, Defendants must file and serve a copy of the proxy statement supplement sent to stockholders, together with proof of transmission, and a calculation of the date by which stockholders could reasonably be expected to have received the supplement (depending upon the means of transmission).

6.  Defendant TICC Capital Corp. may re-notice and re-schedule the previously noticed Special Meeting of Stockholders, to take place on a date not earlier than fourteen (14) calendar days after the transmission receipt date calculated under Paragraph 5 of this Order.

All the foregoing is SO ORDERED.

Dated:   New Haven, Connecticut
         November 25, 2015


                              /s/ Charles S. Haight, Jr.
                              CHARLES S. HAIGHT, JR.
                              Senior United States District Judge

16